2017 UT App 74

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TRACY SCOTT,
Appellant.

Opinion
No. 20140995-CA
Filed May 4, 2017

Fourth District Court, Provo Department
The Honorable David N. Mortensen
No. 131400842

Margaret P. Lindsay and Douglas J. Thompson,
Attorneys for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred,
with opinions.

TOOMEY, Judge:

¶1     Tracy Scott was convicted of murdering his wife. He
appeals, contending he received ineffective assistance of counsel
during trial. We agree and reverse and remand for a new trial.

BACKGROUND

¶2 Tracy Scott and Teresa Scott[1] were married for nineteen years. They had two sons.

¶3 Scott and Teresa's relationship was both "good and bad." Some described it as happy and loving, but it was also contentious, and they fought often. The fights were "explosive" and involved taunting, threatening, name calling, profanity, and sometimes, throwing things at each other. Each of them frequently threatened divorce, and Scott threatened Teresa's life "multiple times."

¶4 The police were called to the couple's house on a number of occasions and in 2008 cited Scott for domestic violence. In that incident, the couple argued, Scott tried to hit Teresa with their car, then threw a towel over her face and punched her in the stomach. Teresa filed for a restraining order and they separated, but she later had the restraining order removed and Scott's citation was expunged. The pair reunited.

¶5 Many of the couple's arguments revolved around finances. The family incurred debt so Teresa could earn a degree, but her lack of employment after graduation was a source of conflict. Teresa criticized Scott for spending money on trips and firearms instead of paying bills or having their roof repaired.

¶6 Some witnesses testified Scott was the aggressor in the couple's fights—that he got more upset and was "more aggressive" than Teresa and that he was responsible for "[e]ighty percent" of the contention. Some testified that Teresa "escalate[d]" the situation, that she "nitpick[ed] and push[ed]"

---

1. Because the parties share a last name, we refer to Teresa by her first name for clarity, with no disrespect intended by the apparent informality. *See Earhart v. Earhart*, 2015 UT App 308, ¶ 2 n.1, 365 P.3d 719.

Scott, and kept "gnawing [at] him" and did "not let stuff go." Scott's coworkers testified that Teresa frequently called his cell phone while he was at work, and the two would argue over the phone. If Scott did not answer his phone, Teresa would call the shop phone or come to his workplace. These calls occurred several times a week, sometimes two or three times a day, for four or five years.

¶7    Leading up to the events of this case, Scott and Teresa's relationship "started to get bad again." Her calls to Scott's work became more frequent. Remarks between them "got nastier" and "more hateful," and in the weeks before her death, Scott and Teresa had "constant arguments." Their fighting was "[w]orse than it had ever been."

¶8    The day before Teresa's death, Scott and Teresa began "fighting and arguing" while Scott was changing the oil in a family car. The argument got "really bad." Scott spilled oil in the driveway, and they continued to fight about the spill and the lack of money to replace the oil. Later, Scott saw that Teresa's mother had called, and he took the phone into their bedroom to give it to Teresa. He saw her crouched by the end of the bed, but did not know what she was doing. As he turned to leave the room, he saw that the family's gun safe had been pulled out from under the dresser where it was usually kept and that it was open. He also saw that Teresa's gun was not in the safe.

¶9    Scott testified he was "scared to death" when he saw the gun was missing. He was nervous and worried, and he went to the garage and stayed there until their sons came home. He did not sleep well that night. The next day Scott ran errands, and while he was putting new tires on the car, twice purchased the wrong size because he "[wasn't] thinking straight." Scott did not want to go home and instead called a coworker to ask if he could spend the night at the coworker's house. The coworker responded that he could meet Scott later that day, and Scott went home. He did some yard work, but he and Teresa were fighting the "whole time."

¶10    Scott went inside the house to use the bathroom. As he walked into the bedroom, he saw Teresa sitting by the end of the bed. Although the gun safe had been shut and put away under the dresser, it was again open and pulled out, and Teresa's gun was still missing. Scott immediately left the house without using the bathroom. He went to the garage, and while he was there, he saw Teresa several times leaning her head out the door and staring at him. Scott called his ecclesiastical leader because he "didn't know what to do"; he testified that he "really start[ed] to wig out, just freak out."

¶11    Finally, Scott decided to return to the house and "confront" the matter. As he walked in, he could hear Teresa talking on the phone with her mother. While he was in the kitchen, Teresa yelled at him, and he "snapped" and "[saw] red." He stormed into the bedroom where he saw her lying on the bed and pointing her cell phone at him. He looked down at the safe and saw that her gun was still missing. He reached down, grabbed the other gun from the safe, and shot Teresa three times, killing her, then called 911. The police arrived and arrested Scott.

¶12    At trial, Scott admitted to killing Teresa, but he argued that he had acted under extreme emotional distress, which would mitigate the murder charge to manslaughter.

¶13    Scott testified that "there was a threat made" and when he saw Teresa's gun missing from the safe he "thought the threat was serious." Defense counsel asked him to elaborate: "When you say a threat [was] made, are you saying—Who threatened who?" As Scott started to explain the background of the threat, the prosecutor objected that it was hearsay. The court sustained the objection and in a sidebar conversation stated, "There's no way that you're going to dance around and get [in] a threat without [it] being hearsay." Defense counsel said "Okay," and did not offer any counterargument. Counsel continued his questioning, asking, "After you saw the safe open . . . then what were you thinking?" Scott replied, "I was thinking that the threat

that I had received the day before . . . [t]hat she was going to—she was . . . ." The court interrupted Scott and called for another sidebar discussion. The court warned defense counsel to stay away from that line of questioning, because "the only responses [it was] getting are clearly hearsay." Counsel agreed and made no attempt to argue that the statements were not hearsay and were admissible. Scott did not mention the threat again.[2]

¶14    At the conclusion of trial, the court instructed the jury on the elements of murder and the special mitigation of extreme emotional distress. The instructions stated:

> A person acts under the influence of extreme emotional distress when the then-existing circumstances expose him to extremely unusual and overwhelming stress that would cause the average reasonable person under that stress to have an extreme emotional reaction, as a result of which he experienced a loss of self-control and had his reason overborne by intense feelings such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

The instructions also stated that "'[e]motional' distress does not include . . . distress that is substantially caused by the defendant's own conduct."

¶15    The jury deliberated for more than five hours and sent two notes to the court. One note asked, "What is the legal definition of 'substantially caused?'" The next note informed the court, "We are at an absolute impasse, 6-2," and continued, "Two feel that 'substantially caused' needs to be 'the majority of the time.'" Defense counsel moved for a mistrial on the basis that

---

2. Scott's testimony did not include the actual words of the threat. The threat's content is not included in the record on appeal, and we do not rely upon it in our analysis.

"absolute impasse" meant that the jury could not "continu[e] to deliberate without doing violence to their individual judgment." The court denied the motion for a mistrial and instead gave a supplemental jury instruction, which asked the jury to "continue [its] deliberations in an effort to agree upon a verdict." The instruction stated, in part,

> This trial represents a significant expenditure of time and effort by you, the court, the parties, and their attorneys . . . and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried to you. . . . Nevertheless . . . it is your duty as jurors to consult with one another and to deliberate, with a view to reaching an agreement, if you can do so without violence to your individual judgment.

¶16 After receiving the supplemental instruction, the jury deliberated for two more hours and found Scott guilty of murder. Scott was sentenced to prison for fifteen years to life. He appeals the conviction.

ISSUES AND STANDARD OF REVIEW

¶17 Scott raises two issues on appeal. First he contends the trial court erred by giving a verdict-urging instruction when the jury was at an absolute impasse. He also contends his counsel provided ineffective assistance at trial. Because we conclude Scott did not receive effective assistance of counsel and reverse on this basis, we need not address the propriety of the court's supplemental instruction.

¶18 When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review, and this court must decide whether the defendant was deprived of effective assistance as a matter of law. *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587. To demonstrate

ineffective assistance of counsel, a defendant must show that his counsel performed deficiently and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

ANALYSIS

I. Deficient Performance

¶19 Scott argues that his counsel's performance was deficient because, when the prosecutor objected to testimony regarding a threat Teresa made to Scott, defense counsel did not attempt to argue the threat was nonhearsay and thus admissible. Scott asserts defense counsel had no tactical purpose for failing to make this argument.

¶20 To show deficient performance under *Strickland*, Scott must demonstrate that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. This standard asks "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). Scott must also "rebut the strong presumption that 'under the circumstances, the challenged action might be considered sound trial strategy.'" *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (quoting *Strickland*, 466 U.S. at 689) (additional internal quotation marks omitted).

¶21 Scott argues on appeal that Teresa's threat was not hearsay and was therefore admissible. "Hearsay" is defined as an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). Scott argues the threat was not hearsay because it was not offered to show the truth of the matter asserted—rather, it was offered to show its impact on Scott. *See* R. Collin Mangrum & Dee Benson, Mangrum & Benson on Utah Evidence 779 (2016) (noting that statements may be relevant "because of

their effect on the hearer" and that such statements have "consistently been held to be nonhearsay in a variety of contexts").

¶22 The State conceded on appeal that the threat was not hearsay, and we agree with both Scott and the State that the threat was not hearsay. Like questions and commands, threats are commonly not hearsay, because they do not make assertions capable of being proved true or false. *See United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985) (stating that a defendant's "threats are not hearsay because [they were] not offered for their truth; the threats are verbal acts"). Here, Scott's testimony concerning the threat was not offered to prove the truth of what Teresa asserted but was offered to show its effect on Scott. Scott's defense depended on demonstrating he shot Teresa while under extreme emotional distress not caused by his own conduct. Testimony about the threat's impact would further Scott's defense that his distress came from an external source. And as Scott testified, when he saw that Teresa's gun was missing from the safe, he "thought the threat was serious." Whether the threat "[was] true is irrelevant, since the crucial factors are that the statements were made and that they influenced the defendant['s] behavior." *See State v. Salmon*, 612 P.2d 366, 369 (Utah 1980) (concluding testimony was not hearsay when it was offered, "not to prove the truth of what [the informant] said to defendants, but rather to show that [the informant] had made statements which induced defendants to commit the offense").

¶23 The threat was not inadmissible hearsay, and it follows that if defense counsel had demonstrated this through proper argument, the court would have allowed Scott to testify about it.

¶24 Scott next argues that his counsel's failure to correctly argue the rules of evidence fell below an objective standard of reasonableness. We agree.

¶25 In this instance, defense counsel failed to correctly use the rules of evidence to support Scott's defense: counsel did not argue the threat was admissible because it was offered to show

its effect on Scott, rather than to prove the truth of what Teresa asserted. Counsel's failure was unreasonable, especially in light of Scott's trial strategy, which was to show that his distress originated outside his own behavior. A serious threat to Scott from Teresa would have been an important piece of evidence at trial, and a reasonable attorney would have used the rules of evidence to explain to the court why the threat was admissible. Counsel's lack of argument did not merely "deviate[] from best practices or most common custom"—it amounted to deficient performance. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011).

¶26    The State argues defense counsel's performance was not deficient because "counsel had a sound strategic reason not to seek to admit the specific words of Teresa's alleged threat." Further, it argues defense counsel did not seek to admit the specific words of the threat because an "imaginary threat" could have had a greater impact on the jury than hearing the actual words.

¶27    We do not agree that this was a sound strategic reason for counsel's actions. While an "imaginary threat" could have allowed the jury to conjure something worse than what Scott would have testified to, the converse is also true. Testimony about the threat's actual content could have connected it to various other aspects of Scott's testimony, including Teresa's threatening behavior in other contexts, and would have established the foundation for testimony about Scott's reaction to seeing the empty gun safe. As it was, Scott did not testify about it and counsel did not refer to it in closing argument, even though the underpinning of Scott's defense was that he acted under distress not substantially caused by his own conduct. Under these circumstances, the negative repercussions of omitting the content of the threat were greater than the possible benefits; admitting its content would only have strengthened Scott's defense. We therefore conclude defense counsel's actions could not have been sound trial strategy.

¶28   Because the threat was central to a defense that focused on trying to show that Scott's conduct originated from distress caused by a source other than his own conduct, there was no strategic reason for counsel not to argue that the threat was admissible. Scott has therefore met his burden in showing that his defense counsel's performance was deficient.

## II. Prejudice

¶29   To demonstrate prejudice, Scott must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶30   Scott argues that prejudice is evident because "the jurors expressed their concerns about the very point of law that the excluded evidence would have had a significant impact on." Because Scott admitted he killed Teresa, the sole issue at trial was whether the killing was mitigated by extreme emotional distress. The notes the jury delivered to the court indicate its deliberations had narrowed in on the definition of "substantially caused." This suggests one or more of the jurors was struggling with whether Scott had "substantially caused" the distress he was experiencing. The second note illuminates how the jury was split: "We are at an absolute impasse, 6-2. Two feel that 'substantially caused' needs to be 'the majority of the time.'" Only after a verdict-urging instruction and two more hours of deliberation did the jury arrive at a guilty verdict.

¶31   Scott argues the jury's second note demonstrates that two of the jurors, if not more,[3] believed Scott was "suffering under

---

3. The jury stated it was "at an absolute impasse, 6-2" and that "[t]wo feel that 'substantially caused' needs to be 'the majority of the time.'" At a minimum, two jurors apparently believed at that

(continued…)

the influence of extreme emotional distress" not substantially caused by his own conduct. As a result, Scott reasons that if the jury had been given more specific evidence regarding the threat, there is a reasonable probability that the result of the trial would have been different.

¶32 The State argues there is no reasonable likelihood the outcome of the trial would have been different if the jury had heard the specific words of Teresa's threat. The jury heard testimony from Scott that Teresa threatened him and that he believed the threat was serious. The jury also heard that after Scott saw the gun missing, he was "scared to death" and "worried that Teresa was going to use that gun to do some harm to [him]." Because of this testimony, the State argues that the "specific words of [the] threat . . . would have added little, if anything, to what the jury already heard."

¶33 Even though Scott testified that "there was a threat made" and seeing that Teresa's gun was missing from the safe made him think "the threat was serious," he was not allowed to offer any other information regarding the threat, including the surrounding circumstances, the words used, and the effect it had on him. After the court warned defense counsel the threat was hearsay and would not be admitted, counsel did not inquire into it again and did not argue, or even imply, that the threat played a role in special mitigation. In contrast, the prosecutor's closing argument stated that Teresa "was no threat" and had not

---

(…continued)

point that Scott was acting under extreme emotional distress not substantially caused by his own conduct. It is also possible two other jurors did not believe Scott qualified for the mitigation because he had caused his distress "the majority of the time." And it is not impossible that six jurors believed Scott qualified for mitigation, while the other two maintained that Scott did not qualify because he had caused his distress the majority of the time.

"provoke[d] him" and asked the jury "what reasonable basis does [Scott] have to make [the] claim that simply the absence of that gun from the safe creates extreme emotional distress[?]" For these reasons, we are persuaded that testimony of the specific threat and its effect on Scott would have given the jury more evidence on the very point that was in dispute.

¶34 In sum, the jury notes demonstrate the jury was at an impasse over whether Scott had substantially caused the distress he felt. At least two jurors were so convinced that Scott acted under extreme emotional distress that the jury described its position as an "absolute impasse." Testimony about the threat would have directly reinforced the sentiments of these two jurors. That testimony also might have influenced the jurors who believed that "substantially caused" meant "the majority of the time." Consequently, had Scott been allowed to testify about the threat, there is a reasonable probability the jury would have continued to be deadlocked, ending the case in a mistrial. This probability is enough to undermine our confidence in the outcome of this trial. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).


CONCLUSION

¶35 We conclude Scott received ineffective assistance of counsel and therefore reverse and remand for a new trial.

─────────

VOROS, Judge (concurring):

¶36 I concur in the majority opinion as a correct statement and application of the law. I write separately to express my concern with the law of extreme emotional distress as it presently exists in Utah, particularly as applied in the context of intimate relationships.

¶37    The facts of the present crime must be viewed against the backdrop of a relationship in which Scott was the usual aggressor. He would call Teresa names like "bitch" or "just anything . . . that could hurt her and make her feel like she was a bad person." In fact, his contact name for her in his cell phone was "Bitch Teresa." Scott threatened "multiple times" to kill Teresa, promising that "'one of these days I'm going to kill you.'" In fact, he did try to kill Teresa once, attempting to run her over with their SUV while their sons were in the back seat. Teresa jumped out of the way. The boys also saw Scott "get physical" with Teresa. One time he threw a towel at Teresa's face and "started punching her in the gut." Another time he "slammed" a vacuum into her legs.

¶38    Teresa would also get mad and yell, but she did not get as angry or aggressive as Scott. The boys never saw her "get physical" with him, call him names, or threaten him. She did call the police a few times. Scott called the police too. During one of the police visits, Scott asked the responding officer to tell Teresa to "stop touching" him. In all, the police came to their home "six to eight times." They arrested Scott on one occasion (he pleaded guilty to domestic violence assault). Teresa obtained a protective order, they separated, but they soon got back together. On the day of the shooting, one of the couple's sons received a call from a friend who asked why the police were at his house; the son called home and nobody answered. He rushed home, worried that Scott had "finally killed her." When the other son heard there had been a fatal shooting, he worried that his "mom was dead."

¶39    And what, according to Scott, ignited his extreme emotional distress? After a fight, he noticed a handgun missing; he heard Teresa on the phone with her mother; she yelled something to him; he stormed into the bedroom and saw her lying on the bed pointing her cell phone at him. In response, he grabbed a gun from the gun safe, cocked it, and shot her three times.

¶40   I do not believe the law should mitigate the culpability of one who kills under these circumstances. "What is generally known as the provocation defense has for two decades been criticized as mitigating violence committed by men against women in intimate relationships." *State v. Sanchez*, 2016 UT App 189, ¶ 40 n.9, 380 P.3d 375, *cert. granted*, 390 P.3d 719 (Utah 2017) *and* 390 P.3d 727 (Utah 2017). It now "is one of the most controversial doctrines in the criminal law because of its perceived gender bias; yet most American scholars and lawmakers have not recommended that it be abolished." Carolyn B. Ramsey, *Provoking Change: Comparative Insights on Feminist Homicide Law Reform*, 100 J. Crim. L. & Criminology 33, 33 (2010); *see also* Emily L. Miller, *(Wo)manslaughter: Voluntary Manslaughter, Gender, and the Model Penal Code*, 50 Emory L.J. 665, 667 (2001) ("Voluntary manslaughter has never been a female-friendly doctrine."); Victoria Nourse, *Passion's Progress: Modern Law Reform and the Provocation Defense*, 106 Yale L.J. 1331, 1332 (1997) ("Our most modern and enlightened legal ideal of 'passion' reflects, and thus perpetuates, ideas about men, women, and their relationships that society long ago abandoned."); Laurie J. Taylor, *Provoked Reason in Men and Women: Heat-of-Passion Manslaughter and Imperfect Self-Defense*, 33 UCLA L. Rev. 1679, 1679 (1986) ("[T]he legal standards that define adequate provocation and passionate 'human' weaknesses reflect a male view of understandable homicidal violence.").

¶41   In my judgment, the law should mitigate the culpability of homicides only where society as a whole can to some degree share the rage animating the killing:

> To maintain its monopoly on violence, the State must condemn, at least partially, those who take the law in their own hands. At the same time, however, some provoked murder cases temper our feelings of revenge with the recognition of tragedy. Some defendants who take the law in their own hands respond with a rage shared by the law. In

such cases, we "understand" the defendant's emotions because these are the very emotions to which the law itself appeals for the legitimacy of its own use of violence. At the same time, we continue to condemn the act because the defendant has claimed a right to use violence that is not his own.

Nourse, 106 Yale L.J. 1331, 1393. This "warranted excuse" approach would mitigate the culpability, for example, of a man who murders his daughter's rapist, but not one who murders his departing girlfriend. *See id.* at 1392.

¶42 But this is not the law in Utah. And here, at least some members of a properly instructed jury seemed to struggle with whether, on these facts, Scott was entitled to special mitigation. In this circumstance, under present law, I cannot say that my confidence in the verdict is not undermined. But like Judge Christiansen, I urge our legislature to revise section 76-5-205.5 so that it can no longer be used to mitigate the final act of abuse perpetrated by an abusive intimate partner.

———

CHRISTIANSEN, Judge (concurring):

¶43 I agree with the majority opinion's conclusion that defense counsel's performance at trial was deficient when he failed to argue that the alleged "threat" made to Scott by Teresa was non-hearsay. As explained by the majority, *supra* ¶ 22, Teresa's alleged threat to Scott was not a statement offered for its truth and thus fell outside of the definition of hearsay. *See* Utah R. Evid. 801(c); *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985). Competent defense counsel should have known enough to correctly argue that the rules of evidence would allow the jury to hear this testimony. And, while I do not believe that hearing the specifics of the alleged threat would ultimately have made a difference in the jury's verdict, I recognize that it is "not within the province of an appellate court to substitute its judgment for

that of a front line fact-finder." *In re Z.D.*, 2006 UT 54, ¶ 24, 147 P.3d 401. Therefore, I agree that remand is warranted.

¶44    However, though I agree with the majority opinion, I write separately to voice my concern regarding the current statutory implementation of the extreme emotional distress (EED) defense. I do not believe the EED defense should have been available to Scott. After Scott had abused and threatened her over the course of several years, he shot an unarmed Teresa three times, including once in the mouth, while she was lying on their bed with her cell phone in her hand. In my view, this "reaction" to the marital difficulties combined with an alleged threat by Teresa does not create a situation in which Scott should be able to claim he was exposed "to extreme emotional distress" that would reasonably explain and mitigate his loss of self-control. Though our courts have employed a generous approach to the EED defense, *see, e.g.*, *State v. White*, 2011 UT 21, ¶ 29, 251 P.3d 820, we must still consider the circumstances surrounding a defendant's purported EED from the viewpoint of a reasonable person. "Thus, the legal standard is whether the circumstances were such that the average reasonable person would react by experiencing a loss of self-control." *Id.* ¶ 36 (citation and internal quotation marks omitted).

¶45    I do not agree with Scott's assertion that a difficult and contentious marriage, combined with Teresa's alleged threat, could have resulted in the type of extremely unusual and overwhelming stress that would cause "the average reasonable person" to experience "a loss of self-control." *See id.* (citation and internal quotation marks omitted). Allowing the defendant to claim special mitigation under facts such as these undercuts and de-legitimizes the proper purpose of the battered-spouse aspect of the EED defense.

¶46    Indeed, the availability of the EED defense to persons in Scott's situation highlights the defense's problematic history. As this court has recently stated, and as noted in Judge Voros's concurring opinion, "What is generally known as the

provocation defense has for two decades been criticized as mitigating violence committed by men against women in intimate relationships. It now is one of the most controversial doctrines in the criminal law because of its perceived gender bias[.]" *State v. Sanchez*, 2016 UT App 189, ¶ 40 n.9, 380 P.3d 375 (citation and internal quotation marks omitted) (collecting authorities), *cert. granted*, 390 P.3d 719 (Utah 2017) *and* 390 P.3d 727 (Utah 2017); *see also, e.g.*, James J. Sing, *Culture as Sameness: Toward a Synthetic View of Provocation and Culture in the Criminal Law*, 108 Yale L.J. 1845, 1865 (1999) (noting that the "provocation doctrine has its historical roots in a value system that embraced the oppression of women"). It is true that EED defense jurisprudence has come a long way since the old common law provocation/heat of passion defense. *See, e.g.*, *State v. Bishop*, 753 P.2d 439, 468–70 (Utah 1988) (plurality opinion) (discussing the evolution of the EED defense in Utah), *overruled on other grounds as recognized by Ross v. State*, 2012 UT 93, 293 P.3d 345. But, as applied here, the EED defense allows an abusive defendant such as Scott (who had committed domestic violence against Teresa and who had at one time been the subject of a restraining order) to claim that the cumulative emotional stress of a difficult marriage and a single alleged threat mitigated his otherwise unprovoked murder of his wife. By doing so, the current statutory implementation of the EED defense gives continued life to antiquated notions of spousal control and perpetuates a belief that violence against women and intimate-partner homicide are acceptable and legitimate. The law should not do so. I therefore urge our legislature to review Utah Code section 76-5-205.5, and to consider explicit recognition in the statute that an abusive spouse or partner cannot claim special mitigation under these types of circumstances.

———————