**2020 UT App 152**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NEPHI ADELINO MAKAYA,
Appellant.

Opinion
No. 20180989-CA
Filed November 5, 2020

Third District Court, Salt Lake Department
The Honorable Ann Boyden
No. 171903822

Teresa L. Welch, and Alexandra S. McCallum,
Attorneys for Appellant

Sean D. Reyes and Thomas Brunker, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

HAGEN, Judge:

¶1      Nephi Makaya caused the death of his pregnant girlfriend by driving his SUV around the warning gates and onto the tracks of an oncoming FrontRunner train.[1] Makaya was charged

---

1. Unlike Utah Transit Authority's (UTA's) electrically-powered TRAX light rail system, UTA's FrontRunner is a traditional commuter train that runs along an 89-mile corridor between Provo and Ogden. FrontRunner trains consist of a diesel-powered locomotive and three or four bi-level and single-level passenger cars. These trains weigh upward of 360 tons and can

(continued…)

with manslaughter and convicted by a jury. On appeal, Makaya contends his trial counsel rendered ineffective assistance when counsel did not move for a directed verdict acquitting him of manslaughter. He asks that we set aside his manslaughter conviction and enter a conviction for the lesser-included offense of negligent homicide. Because Makaya cannot establish a violation of his constitutional right to counsel, we affirm.

BACKGROUND[2]

¶2 After waiting briefly at the activated guard gate of a FrontRunner train crossing, Makaya put his SUV in reverse, backed up 115 feet in the westbound lane, drove around a concrete median, and proceeded down the empty eastbound lane against the normal flow of traffic to bypass the gates and cross the train tracks. Immediately upon entering the tracks, Makaya's SUV was broadsided by a 735,000 pound FrontRunner train.[3] Makaya's girlfriend, who was eight months pregnant and riding in the passenger seat, was thrown from the car and killed. A bystander, who was a nurse, performed chest compressions on

---

(…continued)

reach speeds of up to 79 miles per hour. *FrontRunner*, UTA, https://www.rideuta.com/Services/FrontRunner [https://perma.cc/ML3Q-PYX4].

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Jones*, 2020 UT App 31, ¶ 2 n.1, 462 P.3d 372 (cleaned up).

3. The driver of the FrontRunner train testified that he never saw a vehicle and realized a collision had occurred only when something "flashed in front of [him]" and there was "a loud jolt" and "debris flying out, flying around."

Makaya's girlfriend to keep her unborn baby alive until paramedics arrived. The infant survived but suffered a prolonged lack of oxygen leading to potential long-term complications.

¶3     Makaya told the investigating officer that, when he and his girlfriend pulled up to the railroad crossing at the intersection of 600 West and 900 South in Salt Lake City, the warning gates were down and the warning lights were flashing, indicating that a train was coming. Makaya claimed that they sat "[at the warning gates] for . . . quite some time, a couple [of] minutes," and that after waiting awhile they initially decided to turn around and "go a different way." But then, Makaya claimed, his girlfriend told him to "just go around" the barriers. So Makaya backed up, went around the concrete median separating the two lanes, and drove west down the eastbound lane of 900 South. The investigation showed that this would have required backing up about 115 feet.

¶4     A representative of UTA responsible for the oversight of train line-and-signal systems testified that, based on UTA records, the gates had been down for only 16.84 seconds before the train entered the edge of the roadway. The representative testified that federal regulations require a "minimum of 20 seconds['] warning time to the public" and that the FrontRunner gates at 900 South are programmed to start the signal process 27 seconds before the approach of a train. This process consists of a warning period of flashing lamps followed by the descent of warning gates. Although the records showed that the warning gates at 900 South had previously descended for the passing of a Union Pacific train, the gates had been raised for over two minutes before descending again for the FrontRunner train.

¶5     A video of the collision recorded by a camera on the train indicates that Makaya did not steer away from the train or apply

his brakes before the collision. The State presented evidence that, even after clearing the concrete median and proceeding west down the eastbound lane, Makaya still had double the distance needed to see the warning gates, apply his brakes, and stop before reaching the tracks. But he appeared to have done the opposite. Makaya was traveling approximately 27 to 29 miles per hour upon impact and, according to an expert in accident reconstruction, the only way he could have reached that speed was if he pushed the gas pedal "pretty well to the floor" after clearing the median.

¶6    The State charged Makaya with various offenses and proceeded to trial on one count of manslaughter.[4] At trial, Makaya argued that he was guilty of negligent homicide, but not manslaughter, because he had acted with only criminal negligence, not recklessness. The trial judge instructed the jury on both manslaughter and the lesser-included offense of negligent homicide. Although manslaughter and negligent homicide both require proof that the defendant unlawfully caused the death of another, manslaughter requires that the defendant did so "recklessly" while negligent homicide requires that the defendant did so "with criminal negligence." *See* Utah Code Ann. §§ 76-5-205, -206 (LexisNexis Supp. 2020).[5] The jury convicted Makaya of manslaughter.

---

4. The State also charged Makaya with three lesser offenses related to driving without a license, insurance, or registration; he was convicted of driving on a revoked license, and the insurance and registration charges were dismissed. His conviction for driving on a revoked license is not at issue in this appeal.

5. Because the pertinent language of the statute has not changed, we cite the current version for convenience.

ISSUE AND STANDARD OF REVIEW

¶7 Makaya appeals his conviction, claiming there was insufficient evidence to support a conviction for manslaughter rather than negligent homicide. Makaya admits this issue is unpreserved because his counsel did not move for a directed verdict at trial, but asks that we review it under the ineffective assistance of counsel exception to our preservation requirement. *See State v. Johnson*, 2017 UT 76, ¶¶ 15, 19, 416 P.3d 443 (addressing our preservation requirement and the exceptions our courts have recognized). Makaya argues that he received constitutionally ineffective assistance because his trial counsel did not move for a directed verdict on the manslaughter charge. Where, as here, "a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

ANALYSIS

¶8 Makaya contends that his trial counsel was ineffective in failing to move for a directed verdict at the close of the State's case because the State presented insufficient evidence that he was aware of the risk of hitting a train. To assess whether a defendant's constitutional right to the effective assistance of counsel has been violated, "we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668." *State v. Florez*, 2020 UT App 76, ¶ 40, 465 P.3d 307 (cleaned up). A defendant "must be able to demonstrate (1) that [trial] counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that this deficient performance prejudiced the defense by giving rise to a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* (cleaned up).

¶9    In this case, Makaya cannot establish either deficient performance or prejudice, because a motion for a directed verdict had no chance of success. A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome. As a result, "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." *State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 (cleaned up); *see also State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶10    A motion for a directed verdict based on insufficiency of the evidence is futile when, "upon reviewing the evidence and all the inferences that can be reasonably drawn from it," a court can find that "some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Doyle*, 2018 UT App 239, ¶ 11, 437 P.3d 1266 (cleaned up). In such cases, "trial counsel's decision not to raise a futile motion for a directed verdict would not be deficient performance." *State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979 (cleaned up). On the other hand, "[i]f the State presents no competent evidence from which a reasonable jury could find the elements of the relevant crime, then trial counsel should move for a directed verdict and the failure to do so would likely constitute deficient performance." *Id.* (cleaned up).

¶11    A motion for a directed verdict would have been futile in Makaya's case because the State presented sufficient evidence from which a reasonable jury could find the elements of manslaughter beyond a reasonable doubt. Both manslaughter

and negligent homicide require proof that the defendant unlawfully caused the death of another. *Compare* Utah Code Ann. § 76-5-205 (LexisNexis Supp. 2020), *with id.* § 76-5-206. The distinction between the two crimes turns on the defendant's mental state, or mens rea. Manslaughter requires proof that the defendant acted recklessly. *Id*. § 76-5-205. In contrast, negligent homicide only requires proof that the defendant acted with criminal negligence. *Id.* § 76-5-206. In a different provision, our legislature explained the two differing mens rea concepts in this way:

> A person engages in conduct
>
> . . .
>
> (3) Recklessly with respect to circumstances surrounding his conduct or the result of his conduct when he *is aware of but consciously disregards a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.
>
> (4) With criminal negligence or is criminally negligent with respect to circumstances surrounding his conduct or the result of his conduct when he *ought to be aware of a substantial and unjustifiable risk* that the circumstances exist or the result will occur. The risk must be of a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances as viewed from the actor's standpoint.

*Id.* § 76-2-103(3)–(4) (LexisNexis Supp. 2020) (emphasis added).

¶12    Stated another way, the distinction between manslaughter and negligent homicide is "whether one perceives the risk or doesn't perceive the risk." *State v. Ontiveros*, 835 P.2d 201, 206 (Utah Ct. App. 1992). The "defendant's perception of the risk presents a conjecture-laden inquiry" where "the jury must not only determine the defendant's subjective intent, but must also decide whether an ordinary person who was aware of the risk would act in spite of the risk." *State v. Singer*, 815 P.2d 1303, 1307 (Utah Ct. App. 1991).

¶13    In Makaya's case, the district court instructed the jury on the elements of both the charged offense of manslaughter and the lesser-included offense of negligent homicide. The court also instructed the jury on the difference between reckless conduct and criminally negligent conduct. Jury instruction 16 read, in pertinent part, as follows:

> The concepts of "recklessness" and "criminal negligence" are similar in that both require the presence of a substantial and unjustifiable risk. They differ in that it is reckless to act if one *is aware* of the risk, while it is criminally negligent to act if one *should be aware* of the risk. In either event, the behavior must be a gross deviation from what an ordinary person would do under the same circumstances.

So long as the evidence supported a reasonable inference that Makaya not only should have been aware of a substantial and unjustified risk of death but was aware of that risk and consciously disregarded it, a directed verdict motion on the manslaughter charge would have been denied.

¶14    Here, the State presented ample evidence from which a reasonable jury could find beyond a reasonable doubt that

Makaya was aware of the risk of death posed by driving his car around the warning gates and across the train tracks. As Makaya acknowledges, the crossing arms were lowered, with lights flashing, when he approached the train crossing. Although Makaya told the investigating officer that he had waited "two to three minutes" without seeing a train, the evidence showed that the warning system was not activated until 27 seconds before the train's arrival. Before that, the gates had been open for at least two minutes. Makaya also admitted that he backed up and drove around "the concrete barrier and into the opposite side of traffic to get across the crossing." The State presented evidence that this maneuver entailed backing up around a 115-foot barrier, and then proceeding the wrong way down the eastbound lane of traffic. A reasonable jury could conclude that Makaya was aware of and consciously disregarded a substantial and unjustifiable risk of death from encountering a train on the tracks when he saw the lowered crossing gates and lights flashing but nonetheless chose to back up and proceed down the opposite lane of traffic to bypass the safety devices.

¶15     Additionally, an expert in accident reconstruction testified that, to reach the speed the SUV was going at the time it reached the tracks, Makaya must have pushed the gas pedal "pretty well to the floor." The expert further testified that, after Makaya drove around the median and began to accelerate down the eastbound lane of traffic, he still would have had enough roadway to brake and stop before the tracks. But there was no evidence he had attempted to do so. A reasonable juror could infer that flooring the gas pedal rather than stopping to see if a train was coming meant Makaya was trying to beat a train and knew that his actions created a substantial and unjustified risk of death to his passenger.

¶16     Makaya asserts that the jury's verdict was based on "speculation and conjecture" rather than reasonable inferences because the evidence showed he was not aware of the train's

approach and the risk it presented. To be sure, the jury heard evidence that could have supported the defense theory that Makaya "did not perceive the risk of fatally injuring Girlfriend by driving through the grade crossing." For example, Makaya told the investigating officer that he "thought they had waited a long time for a train to arrive and saw no train," which could have supported an inference that he thought the safety devices had malfunctioned and that no train was actually coming. There was also evidence to support his claim that he never saw the train because he was "multitasking several driving procedures" and had "limited visibility." According to Makaya, even the fact that he "pushed the gas pedal to the floor as he traveled through the gate crossing" could support an inference "that he did not know that the train was approaching."

¶17    But the evidence Makaya points to does not preclude a reasonable inference that he was aware of the substantial and unjustified risk created by his conduct. Instead, Makaya has only pointed to conflicting evidence of his state of mind, which "alone cannot justify taking the case away from the jury." *State v. Torres*, 2018 UT App 113, ¶ 21, 427 P.3d 550. Indeed, whether Makaya saw the train is not dispositive of whether he consciously disregarded a known risk. The State presented evidence that Makaya disregarded the lowered crossing arms and flashing lights, backed up around a median, drove into the oncoming lane of traffic, and sped toward the activated warning gates rather than cautiously approaching the crossing. Even if he never saw the train, a reasonable jury could conclude beyond a reasonable doubt that Makaya was aware of but consciously disregarded a substantial and unjustifiable risk of causing his girlfriend's death.

¶18    Given the evidence presented at trial, a directed verdict motion would have been denied. Because failure to raise a futile motion does not constitute ineffective assistance of counsel,

Makaya's attorney did not render ineffective assistance by choosing not to make such a motion.

## CONCLUSION

¶19 Because a reasonable jury could have concluded that Makaya consciously disregarded a known risk by driving his SUV around the warning gates and onto the FrontRunner tracks, a directed verdict motion would have been futile. Counsel's decision not to make a futile motion does not constitute ineffective assistance. Therefore, we affirm Makaya's conviction.

———————