**2022 UT App 107**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
XAVIER SOTO,
Appellant.

Opinion
No. 20200272-CA
Filed September 1, 2022

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 191900401

Emily Adams and Freyja Johnson,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUSTICE DIANA HAGEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.[1]

HAGEN, Justice:

¶1      While at the house of a mutual friend, Trevor[2] saw Xavier
Soto fighting with Soto's girlfriend and decided to intervene. To
break up the fight, Trevor moved between the arguing couple and

---

1. Justice Diana Hagen began her work on this case as a judge of
the Utah Court of Appeals. She became a member of the Utah
Supreme Court thereafter and completed her work on this case
sitting by special assignment as authorized by law. *See generally*
Utah R. Jud. Admin. 3-108(4).

2. A pseudonym.

hit Soto. Soto responded by chasing Trevor down an alley and across a street leading to a patch of grass. The events that occurred next were out of view of witnesses, but only Soto returned from the alley while Trevor was left lying in the grass with two fatal stab wounds. A jury convicted Soto of murdering Trevor. Soto now appeals, arguing that his trial counsel rendered constitutionally ineffective assistance by failing to object to certain testimony at trial. Because Soto has not shown both deficient performance and prejudice, we affirm.

BACKGROUND[3]

*The Stabbing*

¶2     On the evening of February 2, 2019, between 9:30 and 10:00 p.m., Soto and his then-girlfriend went to visit a friend. The friend's house was just down the street from the apartment where Trevor and his girlfriend, Sarah,[4] were staying. That night, Trevor and Sarah had walked down to the friend's house to use drugs. Trevor did not know Soto, but he had known the friend for many years.

¶3     While at the friend's house, Soto and his girlfriend got into an argument, and the friend's mother asked them to leave. Soto left, but his girlfriend stayed behind. Later, Soto returned to the house and resumed the argument. The mother attempted to separate the two by asking the girlfriend to accompany her on an errand.

---

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Makaya*, 2020 UT App 152, n.2, 476 P.3d 1025 (cleaned up).

4. A pseudonym.

¶4      As the mother and the girlfriend attempted to leave in the mother's car, Soto kept arguing with the girlfriend. Outside the house, the argument developed into a physical fight, which was witnessed by the friend, his mother, and his uncle, as well as by Trevor and Sarah. At one point, Soto had the girlfriend on the ground and was straddling her. While Soto was on top of the girlfriend, the uncle heard the mother say, "Get that knife away from her throat." Trevor asked the friend if he should intervene. The friend told him to mind his own business and went back inside the house. Sarah agreed and told Trevor to "worry about his own relationship problems." But Trevor ignored the advice, dropped his coat and backpack, and approached the arguing couple.

¶5      Trevor put himself between Soto and the girlfriend and hit Soto. The girlfriend claimed that she did not see what happened next because she looked away. But Sarah saw Soto immediately chase Trevor down an alley. Sarah turned to the girlfriend and said, "[Trevor] did that so you could get in the car and leave now." Soto's girlfriend got into the mother's car and they both left.

¶6      Sarah waited by herself for Trevor to return. After waiting for a few minutes, she saw only Soto return to the friend's house. Thinking Trevor had "made it home," Sarah walked back to the apartment where they were staying to look for him. But upon returning to the apartment, Sarah discovered that Trevor was not there. Sarah walked back down the street toward the friend's house looking for Trevor when she saw that "the whole block was lit with police."

*The Investigation*

¶7      Shortly before 10:00 p.m., police responded to a report of an unconscious person near the friend's house. At the scene, the officers found Trevor with a "traumatic injury" and took him to the emergency room. Trevor died before arriving at the hospital

from a "laceration to his back and a stab wound to his chest . . . that penetrated [his] heart."

¶8      Officers interviewed the witnesses at the house and canvassed the neighborhood, looking for security cameras that potentially could have recorded the stabbing. When Sarah spoke with a detective, she was holding a beer in her hand and admitted that she had smoked marijuana and used methamphetamine that night. Sarah also told the detective that she had been hearing voices that night, and she later admitted at trial that she had a history of schizophrenia.

¶9      Sarah told police that she saw Soto chase Trevor down the alley, but she doubted that she could identify Soto because she had not known him prior to that night. Indeed, Sarah could not correctly identify Soto in a photograph lineup. She later testified that her focus had been on Trevor after he hit Soto and that she had not focused on Soto to "be able to identify him later."

¶10     During the canvass of the area, the officers recovered video footage from a neighbor's security camera that showed some of what occurred the night of the murder. The video showed two men running down an alley, one in front of the other. The man behind could be seen making a stabbing motion toward the back of the second man as they ran past the camera and out of view. Then the video showed the man who made the stabbing motion running in the opposite direction back toward the friend's house, alone. Trevor was found just out of view of the camera in the direction in which the two men were running and from which only one man returned.

¶11     After interviewing the witnesses and reviewing the neighbor's security camera footage, the officers obtained an arrest warrant for Soto but were unable to locate him after several attempts. On February 13, Soto turned himself in. Soto was charged with murder, obstruction of justice, and possession or use of a dangerous weapon by a restricted person.

*The Trial and Challenged Testimony*

¶12    Before trial, Soto moved to exclude or limit the video footage from the neighbor's security camera. Defense counsel argued that the video footage's "probative value is virtually nonexistent" because it was in black and white with low resolution and of such poor quality "that any identification as to who [the two individuals] are, what they are wearing, or how their movements are demonstrative of the sequence of events would be entirely speculative." The defense also argued that "the added problem is that the State, as it did at the Preliminary Hearing[,] will have officers testify as to what they speculate the video shows," which would be highly prejudicial. The district court determined that the video was admissible and that defense counsel could raise any objections at trial to officer testimony commenting on the video.

¶13    At trial, all five of the eyewitnesses to the altercation—Soto's girlfriend, the friend, the mother, the uncle, and Sarah—testified that Soto and his girlfriend had been arguing and that the quarrel made its way outside the house. Although the girlfriend testified that Soto did not assault her, the other witnesses testified that the fight became physical. The mother testified that she saw Soto grab the girlfriend by her hair and force her to the ground. The uncle testified that he saw Soto get on top of the girlfriend, yelling as he straddled her body. The uncle also testified that, during the fight, he heard the mother shout, "Get that knife away from her throat." The mother was never asked at trial if she made this statement or whether she saw Soto with a knife that night.

¶14    Sarah was the last eyewitness to testify at trial. The State relied heavily on Sarah's testimony, given that she was the only person who saw Soto chase Trevor down the alley and was the only person who saw Soto return alone a few minutes later. Sarah testified that when Soto and his girlfriend were fighting, Trevor asked the friend if he should intervene and was told to mind his

own business—a sentiment Sarah had agreed with. Rather than listen to Sarah and the friend, Trevor dropped his coat and backpack and walked up to Soto. Sarah did not know "if he nudged [Soto] in his chest or what happened. And then [Trevor] took off running, and [Soto] took off running after [Trevor]." Sarah explained that she waited for Trevor to return, but she saw only Soto walk back up the alley and go back into the friend's house.

¶15   While on the stand, Sarah admitted that she had been diagnosed with schizophrenia and depression, that she sometimes hears voices, and that on the night of Trevor's death she had used marijuana and methamphetamine and had been drinking alcohol.

¶16   Following Sarah's testimony, the State called the detective who had interviewed Sarah the night of the murder. The detective explained to the jury the importance of Sarah's observations and how her information had been "able to connect the dots" from where Trevor was found to where the initial altercation between Trevor and Soto occurred. He recounted Sarah's statements to police that she had seen Soto chase Trevor down the alley and that only Soto had returned, and he explained how those facts, together with other witnesses' statements about the altercation between Soto and the girlfriend, helped him piece together the events of that night. He also testified that Sarah's statements— made to him prior to knowing whether video evidence was available—were consistent with the surveillance video later recovered. Defense counsel did not object to the detective repeating the statements Sarah made during her police interview, nor did he object to the detective's summation of his investigation.

¶17   During the detective's testimony, the State played the surveillance video for the jury while the detective narrated, pausing portions of the video for the detective to explain what he saw. The detective explained that two men were running up the

street, with one man in front of the other. The detective testified: "And what you will see specifically, the front figure is running. The person in the back—individual in the back gets really, really close to him. And you're going to see their right hand make a downward [stabbing] motion like this. You'll see that very clearly in there." The detective also explained that moments after the two men went out of view, one man returned and began running back toward the friend's house. The detective explained that the time stamp on the video was "significant" because it was recorded just before Trevor was found mortally wounded on February 2.

¶18 After narrating the video, and without objection from defense counsel, the detective told the jury that the video aligned with the information he received from Sarah in her initial interview and with Sarah's testimony at trial.

¶19 Near the end of its redirect examination, the State asked the detective whether "there was a question that [the mother] asked [him] during [his] interview with her that [he] felt was important to note in [the] police report." The detective responded that the mother had asked, "Did [Soto] hurt him?" Defense counsel did not object to the State's question or the detective's response.

¶20 For its part, the defense suggested, both in cross-examination of various witnesses and in closing argument, that it was the friend, not Soto, who had killed Trevor. The jury rejected this defense and convicted Soto of murder. Soto appeals.

ISSUES AND STANDARD OF REVIEW

¶21 Soto contends that his trial counsel performed deficiently when he failed to object to certain portions of the detective's testimony that amounted to either hearsay or improper opinion. Soto also contends that his trial counsel performed deficiently when he did not object to hearsay testimony repeating two out-of-court statements by the mother. "When a claim of ineffective

assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up).

ANALYSIS

¶22    "To prevail on an ineffective-assistance-of-counsel claim, a defendant must show both that counsel's performance was objectively deficient, and a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Reid*, 2018 UT App 146, ¶ 19, 427 P.3d 1261 (cleaned up). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Id.*

¶23    We first address Soto's contention that he received ineffective assistance of counsel when his trial counsel failed to object to the detective's testimony recounting Sarah's interview statements, narrating the surveillance video, and opining on the consistencies in the evidence. Next, we address Soto's contention that his counsel was ineffective in failing to object to either the detective's testimony recounting the mother's question or to the uncle's testimony recounting the mother's statement during the altercation. We conclude that Soto was not prejudiced by the detective's testimony and therefore is not entitled to a new trial based on ineffective assistance of counsel. And because a reasonable attorney could conclude that the mother's statements were not hearsay or fell within an exception to the hearsay rule, counsel did not perform deficiently by not raising an objection.

A.    Soto Was Not Prejudiced by the Detective's Testimony.

¶24    Soto contends that his trial counsel performed deficiently by allowing the detective to testify "extensively about [Sarah's]

hearsay statements[] without objection" and by allowing the detective to improperly comment "on the evidence, including narrating the evidence for the jury, opining on [Sarah's] 'credibility' and consistency, and opining on the weight of the evidence." Even assuming without deciding that counsel performed deficiently in not objecting to the detective's testimony, Soto has not established a reasonable likelihood of a different outcome had the detective's allegedly improper statements not been admitted.

¶25   "To evaluate prejudice under *Strickland*, 'we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance.'" *State v. Garcia-Flores*, 2021 UT App 97, ¶ 27, 497 P.3d 847 (quoting *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203). Under a counterfactual analysis, "we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." *State v. Leech*, 2020 UT App 116, ¶ 67, 473 P.3d 218; *see also Garcia-Flores*, 2021 UT App 97, ¶ 27 ("The counterfactual analysis requires us to consider a hypothetical—an alternative universe in which the trial went off without the error." (cleaned up)). Here, we conclude that there is no reasonable probability that the jury would have reached a different result if the detective (1) had not narrated the video, (2) had not repeated Sarah's statements, and (3) had not commented on the consistency of Sarah's testimony or the strength of the evidence.

¶26   First, there is no reasonable probability that the jury would have reached a different result if the detective had not narrated the video. Even without the detective's narration, the consistency between Sarah's testimony and the video would have been apparent to the jury. The video showed two people running down an alley, one person making a stabbing motion, and the person who made the stabbing motion returning alone. The jurors could have compared this video evidence to Sarah's testimony, in which

she stated that the man who had been fighting with his girlfriend chased Trevor down an alley and then returned alone. The detective's narration of the video and his observation that the video was consistent with Sarah's statements did not provide any additional information that the jury would not have otherwise had.

¶27  Second, there is no reasonable probability that the detective's repetition of Sarah's statements altered the outcome because Sarah testified at trial and recounted the same facts. When an out-of-court declarant does not testify at trial, we are more likely to conclude that the improper admission of that declarant's hearsay statements prejudiced the defense. *See, e.g., State v. Ellis*, 2018 UT 2, ¶ 44, 417 P.3d 86 (holding that the admission of hearsay testimony was prejudicial where the declarant did not testify at trial). But here, Sarah appeared as a witness at trial and testified to each fact that was later repeated by the detective. Soto has identified no information that the jury received from the detective that it did not already have through Sarah's sworn testimony. There is no reasonable probability that allowing the detective to repeat the statements that the jury had already heard directly from Sarah had any impact on the outcome.

¶28  Third, there is no reasonable probability that the jury would have questioned the credibility of Sarah's testimony absent the detective's assertion that it was consistent with both the statements Sarah made on the night of the murder and the other evidence obtained after she made those statements. Soto argues that without the alleged bolstering, the jury could have discounted Sarah's testimony because she had been using drugs, was diagnosed with schizophrenia, had heard voices that night, and could not identify Soto in a photograph lineup. But the consistency between Sarah's statements and the other evidence would have been apparent to the jury even without the alleged bolstering.

¶29 In addition, the jury was not required to credit Sarah's uncorroborated testimony in order to convict. The key points of Sarah's testimony were corroborated by multiple witnesses and by the video evidence before the jury. Four eyewitnesses confirmed Sarah's testimony that Soto and his girlfriend were fighting that night. The friend backed up Sarah's testimony that Trevor had wanted to break up the fight, and the girlfriend confirmed Sarah's testimony that Trevor decided to intervene by striking Soto. The only relevant fact that was not corroborated by another witness was Sarah's testimony that she saw Soto chase Trevor down the alley and that Soto later returned alone. But even this testimony was substantiated by the video that showed two people running down the alley at the time of the fight and one person returning alone. The jury was not required to rely on Sarah's testimony alone to convict. We conclude that there is no reasonable probability that the alleged bolstering by the detective affected the jury's verdict.

¶30 Under these circumstances, the evidentiary landscape would not have materially changed if trial counsel had successfully objected to the portions of the detective's testimony challenged on appeal. Because Soto has not shown a reasonable probability that the result of the trial would have been different but for his trial counsel's alleged errors, we reject his claim of ineffective assistance of counsel.

B.   Trial Counsel Did Not Render Deficient Performance by Not Objecting to the Mother's Out-of-Court Statements.

¶31 Soto also contends trial counsel performed deficiently in not objecting to the mother's allegedly inadmissible out-of-court statements. To demonstrate that counsel performed deficiently, a defendant "must overcome the presumption that [c]ounsel's challenged actions and decisions fell 'within the wide range of reasonable professional assistance.'" *State v. Guerro*, 2021 UT App 136, ¶ 34, 502 P.3d 338 (quoting *Strickland v. Washington*, 466 U.S.

668, 689 (1984)). Where "counsel could have reasonably believed that an objection was futile," counsel has not performed deficiently. *State v. Ring*, 2018 UT 19, ¶¶ 43, 47, 424 P.3d 845; *see also State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). A futile objection "necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make [an objection] that would not have been granted, and forgoing such [an objection] does not prejudice the outcome." *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025; *see also State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 ("The failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." (cleaned up)).

¶32 Soto challenges two out-of-court statements by the mother as inadmissible hearsay. First, Soto points to the detective's testimony that when he interviewed the mother, she asked, "Did [Soto] hurt him?" Second, Soto points to the uncle's testimony that the mother said, "Get that knife away from her throat." Because trial counsel could have reasonably concluded that both statements were admissible, trial counsel did not perform deficiently in failing to object.

¶33 First, counsel reasonably could have determined that the mother's question to the detective—"Did [Soto] hurt him?"—was not hearsay. Under rule 801 of the Utah Rules of Evidence, hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). Rule 801(a) defines "statement" as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." As a general matter, "questions . . . are commonly not hearsay, because they do not make assertions capable of being proved true or false." *See State v. Scott*, 2017 UT App 74, ¶ 22, 397 P.3d 837, *rev'd on other grounds*, 2020 UT 13, 462 P.3d 350; *see also* 30 Charles Alan Wright,

Arthur R. Miller & Daniel D. Blinka, *Federal Practice and Procedure* § 6568 (2d ed. 2022) ("When one asks a question, one is usually seeking information, not conveying it.").

¶34 Here, counsel could have reasonably believed that the mother's question was merely an inquiry, seeking information about what happened to Trevor, rather than an assertion. Although "there may be instances where a party attempts to admit hearsay by cloaking statements under the guise of a question, the focus of the inquiry should be on what the declarant intended to say, whether implied or directly asserted." 30 Charles Alan Wright, Arthur R. Miller & Jeffrey Bellin, *Federal Practice and Procedure* § 6726 (2d ed. 2022) (cleaned up). Under the circumstances of this case, it was at least arguable that the mother did not ask the question with the intention of making an implied assertion. Accordingly, it was reasonable for counsel to forgo an objection to this question at trial. *See Makaya*, 2020 UT App 152, ¶ 9.[5]

¶35 Second, Soto has not established that it was objectively unreasonable for trial counsel not to object to the uncle's testimony that he heard the mother say, "Get that knife away from her throat." Trial counsel could have reasonably concluded that

---

5. Soto also argues that, in the context of rule 403 of the Utah Rules of Evidence, the question had "minimal probative value" and was outweighed by unfair prejudice. Although we agree that the probative value of the mother's statement was minimal, Soto has not established that it was so unfairly prejudicial that trial counsel's only defensible choice was to object. *See, e.g., State v. Larabee*, 2013 UT 70, ¶¶ 10, 26–33, 321 P.3d 1136 (concluding that, in the context of a child sex abuse case where the trial court had excluded all evidence of prior allegations of sexual abuse, counsel's failure to object to a prosecutor's statements in closing argument regarding prior allegations of sexual abuse was "patently unreasonable" (cleaned up)).

the statement fell within the present sense impression exception to the hearsay rule. *See* Utah R. Evid. 803(1). That exception applies to a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." *Id.* "The rationale underlying the present sense impression exception is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *State v. Johnson*, 2022 UT 14, ¶ 26, 508 P.3d 100 (cleaned up).

¶36 According to the uncle, the mother made the challenged statement while the fight between Soto and his girlfriend was ongoing. Her contemporaneous statement purported to describe what was happening as she perceived it. Because the statement arguably fell within a recognized exception to the hearsay rule, it was not unreasonable for counsel to conclude that it was admissible and that any objection would be futile. *See Makaya*, 2020 UT App 152, ¶ 9.

CONCLUSION

¶37 We conclude that Soto was not prejudiced by his counsel's failure to object to the detective's narration of the surveillance video or testimony regarding Sarah's statements. Even if an objection to the testimony had been raised and sustained, all of the information the detective provided would still have been before the jury through other witness testimony and evidence. We also conclude that Soto's counsel did not perform deficiently by not objecting to alleged hearsay. Reasonable counsel could have concluded that an objection would have been futile because the mother's out-of-court statements either were not hearsay or fell within an exception to the hearsay rule. Accordingly, we affirm Soto's conviction.

———————