**2022 UT App 81**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TRACY SCOTT,
Appellant.

Opinion
No. 20140995-CA
Filed June 24, 2022

Fourth District Court, Provo Department
The Honorable David N. Mortensen
The Honorable Christine S. Johnson
No. 131400842

Margaret P. Lindsay and Douglas J. Thompson,
Attorneys for Appellant

Sean D. Reyes, Tera J. Peterson, and Marian Decker,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGE JILL M. POHLMAN concurred. SENIOR JUDGE KATE APPLEBY concurred in part and dissented in part, with opinion.[1]

CHRISTIANSEN FORSTER, Judge:

¶1      This case returns to us on remand from the Utah Supreme Court to reconsider Tracy Scott's claims of error after obtaining additional information from the district court. Scott was tried before a jury and convicted of murder. At this stage, we are asked to consider two issues: first, whether a verdict-urging instruction the trial court read to the jury after it indicated it was deadlocked was coercive under the circumstances; and second, whether

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

Scott's trial counsel rendered constitutionally ineffective assistance after the content of an out-of-court statement made by the victim was excluded, and trial counsel failed to make any argument that the statement was being offered for a non-hearsay purpose. We conclude that Scott cannot make his required showing on either issue and affirm his conviction.

## BACKGROUND[2]

¶2 After fighting intensely with each other over the course of several days, Scott shot his wife, Teresa,[3] three times while she was lying on their bed. *State v. Scott* (*Scott I*), 2017 UT App 74, ¶¶ 7–11, 397 P.3d 837, *rev'd*, 2020 UT 13, 462 P.3d 350. The couple had been married for nineteen years, and during that time experienced significant conflict. *Id.* ¶¶ 2–6.

¶3 The State charged Scott with domestic violence murder for killing Teresa. Although Scott admitted that he shot her, he sought a reduction in the charges, arguing that he acted under extreme emotional distress from Teresa's actions in the days before the murder.[4] *See id.* ¶ 12. He testified that events preceding

---

2. We present a slightly truncated version of the facts leading to Teresa's death, instead highlighting the issues presented at this stage of the case. A more thorough recitation is set forth in our prior opinion, *see State v. Scott* (*Scott I*), 2017 UT App 74, ¶¶ 2–16, 397 P.3d 837, *rev'd* 2020 UT 13, 462 P.3d 350, as well as in the supreme court's opinion, *see State v. Scott* (*Scott II*), 2020 UT 13, ¶¶ 5–26, 462 P.3d 350.

3. Because the defendant and victim share a last name, we refer to Teresa by her first name with no disrespect intended by the apparent informality.

4. The version of the Utah Code in effect at the time these events took place allowed a person found guilty of murder to receive a

(continued…)

the shooting had made him "scared to death" of what Teresa might do to him. *Id.* ¶ 9. Specifically, Scott asserted that the day before he shot Teresa, he noticed her gun was absent from the gun safe in their bedroom and this discovery frightened him, making him "worried that Teresa was going to use that gun to do some harm to [him]." *Id.* ¶ 32. He also stated that on the day of the shooting, he noticed Teresa's gun was still missing from the safe. *Id.* ¶ 10. After that, Scott testified that he left the house and stayed in the garage for some time and, while he was there, Teresa repeatedly leaned her head out the door and stared at him. *Id.*

¶4 This behavior prompted Scott to "really start[] to wig out, just freak out." *Id.* He resolved at that point that he needed to reenter the house and "confront" the situation, but as soon as he entered the kitchen, the two continued fighting. *Id.* ¶ 11. Scott eventually "snapped," at which point he went into the bedroom—where Teresa was lying on the bed and pointing her cell phone at him—and took his own gun from the open safe and shot Teresa three times. *Id.* Scott called 911 and was arrested shortly after authorities arrived. *Id.*

¶5 During Scott's testimony at trial, he also attempted to explain his fear of Teresa by recounting a threat she allegedly made against him a few days before the shooting—a threat he "thought . . . was serious." *See id.* ¶ 13. As Scott began to elaborate on the threat, the prosecutor objected, asserting that what Teresa

---

"[s]pecial mitigation" and "instead be found guilty of manslaughter" if the trier of fact found "by a preponderance of the evidence" that the defendant had been "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse" when the killing occurred. *See* Utah Code Ann. § 76-5-205.5(1)(b), (5) (LexisNexis 2012). But the mitigation was not available when the defendant's extreme emotional distress was "substantially caused by the defendant's own conduct." *Id.* § 76-5-205.5(3)(b).

said was hearsay,[5] and therefore could not be admitted into evidence for the jury to consider. *Id.* The court sustained the objection, stating during a sidebar, "There's no way that you're going to dance around and get [in] a threat without [it] being hearsay." *Id.* Trial counsel responded simply, "Okay," and moved on without any counterargument. *Id.* As a consequence, the jury never heard the actual language of the threat, but it was not told to disregard Scott's reference to "the threat" he claimed he had received. *See id.*

¶6      Following the presentation of evidence, the trial court instructed the jury. One instruction defined extreme emotional distress:

> A person acts under the influence of extreme emotional distress when the then-existing circumstances expose him to extremely unusual and overwhelming stress that would cause the average reasonable person under that stress to have an extreme emotional reaction, as a result of which he experienced a loss of self-control and had his reason overborne by intense feelings such as passion, anger, distress, grief, excessive agitation, or other similar emotions.

The court followed this with another instruction, which informed the jury that "[e]motional distress does not include . . . distress that is *substantially caused* by the defendant's own conduct." (Emphasis added.)

---

5. Hearsay statements are largely excluded from being admitted into evidence, *see* Utah R. Evid. 802, and include "oral assertion[s]" made out-of-court that "a party offers . . . to prove the truth of the matter asserted in the statement," *id.* R. 801(a), (c)(2).

¶7     During deliberations, the jury sent the trial court two notes. The first asked, "What is the legal definition of 'substantially caused?'" *Scott I*, 2017 UT App 74, ¶ 15. The court and counsel for both parties discussed the issue outside of the jury's presence and agreed that "[t]here is no legal definition" for "substantially caused" because "the legislature hasn't defined it." Accordingly, the court did not give the jury a supplemental instruction defining the phrase.

¶8     Without a direct response to its question, the jury continued to deliberate. At some point, it sent a second note stating, "We are at an absolute impasse, 6-2," and elaborating that "[t]wo feel that 'substantially caused' needs to be 'the majority of the time.'"

¶9     After receiving the second note, the court held another discussion with both counsel. Trial counsel moved for a mistrial, asserting that the jury foreperson's use of the phrase "absolute impasse" meant that the jurors could not "come to an agreement, and that continuing to deliberate [would] make it so that somebody has to give up their honestly held convictions." The prosecutor, on the other hand, proposed crafting an instruction that would define the word "substantial" or, in the alternative, giving the jury an "*Allen* instruction." *See generally Allen v. United States*, 164 U.S. 492 (1896) (generally approving the use of supplemental verdict-urging instructions when a jury is deadlocked); *State v. Lactod*, 761 P.2d 23, 30–31 (Utah Ct. App. 1988) ("uphold[ing] the non-coercive use of *Allen* charges" in Utah but recognizing that "there are certain inherently coercive ideas which should not be included in an *Allen* charge" and adopting a two-part test to determine if such an instruction is impermissibly coercive). The trial court disagreed with trial counsel that there was "anything different between an impasse and an absolute impasse," and interpreted the jury's note as merely conveying that it had "really tried" up to that point, but was having difficulty reaching a verdict. The court also recognized the importance of "look[ing] at [the situation] in context," observing that it was not yet "late at night," which for a

weeklong trial meant that the jury had not been deliberating "that long," and also observed that the second note's wording could suggest the jury "might actually be breaking in favor of the defense." Given this context, the court found it was "appropriate to give an *Allen* charge." The court also made clear that the instruction would ask the jury to continue its deliberations, "specifically asking [jurors] to review all the instructions" already given, while reminding them "not to give up their honest convictions." With those standards in mind, the court opined that its verdict-urging instruction would be "comport[ing] with the case law."

¶10    Less than six hours into deliberations, the trial court read the jury a verdict-urging supplemental instruction:

> Members of the jury, I'm going to ask you to continue your deliberations in an effort to agree upon a verdict. I am specifically asking you to review all of the jury instructions I have previously given to you.
>
> This trial represents a significant expenditure of time and effort by you, the court, the parties, and their attorneys. If you should fail to agree upon a verdict, the case is left open and may have to be tried again, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried to you.
>
> In order to bring eight minds to a unanimous result jurors should examine with candor the questions submitted to them, with due regard and deference to the opinions of each other. All jurors should consider whether their position is a reasonable one, when it makes no impression on the minds of another equally honest, equally intelligent juror, who has heard the same evidence, with an

equal desire to arrive at the truth, under the sanction of the same oath.

Nevertheless, as I previously instructed you, it is your duty as jurors to consult with one another and to deliberate, with a view to reaching an agreement, if you can do so without violence to your individual judgment. You each must decide the case for yourself, but should do so only after a consideration of the case with your fellow jurors. You should not hesitate to change an opinion if convinced that it is erroneous. However, you should not surrender your honest convictions concerning the effect or weight of evidence for the mere purpose of returning a verdict or solely because of the opinion of the other jurors.

¶11 After this instruction, the jury deliberated for approximately two more hours, then returned a verdict finding Scott guilty of murder. Scott was sentenced to a prison term of fifteen years to life.

¶12 Scott appealed, arguing (1) that "the trial court [had] erred by giving a verdict-urging instruction when the jury was at an absolute impasse" and (2) that his trial counsel rendered ineffective assistance in failing to argue that the content of Teresa's threat was not hearsay and therefore admissible. *See Scott I*, 2017 UT App 74, ¶¶ 17, 21. In the first opinion considering his appeal, this court was persuaded that Scott had successfully demonstrated ineffective assistance of counsel, *see id.* ¶¶ 19–35, and as a consequence, we did not address the propriety of the verdict-urging instruction, *see id.* ¶ 17. Accordingly, we reversed Scott's conviction and remanded the case to the district court for a new trial. *Id.* ¶ 35.

¶13 The State petitioned for a writ of certiorari, which our supreme court granted. *State v. Scott* (*Scott II*), 2020 UT 13, ¶ 26,

462 P.3d 350. The supreme court determined that this court erred by concluding Scott had received ineffective assistance of counsel, holding that "there was insufficient information" for us to make this determination on deficient performance or prejudice without knowing the specific "content of the threat." *See id.* ¶¶ 41, 46. The supreme court thus reversed and remanded the matter, instructing us to proceed with a remand to the district court, under rule 23B of the Utah Rules of Appellate Procedure, to determine the content of Teresa's threat. *Id.* ¶ 47. The supreme court also directed us to address Scott's "remaining claim regarding the [trial] court's 'verdict-urging' jury instruction." *Id.*

¶14 Once remanded to this court, we remanded the case to the district court for additional findings of fact regarding trial counsel's actions and what Scott would have testified to regarding the specifics of the alleged threat.

¶15 The district court issued several pages of findings on remand, based on a stipulation by the parties. With regard to Scott's trial counsel and the overall defense strategy, the court found that "[t]he main objective at trial [had been] to show that [Scott] was under the influence of extreme emotional distress at the time of the shooting, and that the distress was not substantially caused by [Scott's] own conduct." In pursuit of this strategy, the district court found that "[t]he defense [had] planned to show Teresa's conduct included her escalating the level of their fighting, a specific threat Teresa made in the days preceding the shooting, and Teresa's introduction of a gun into the already tense situation caused [Scott's] extreme emotional distress."

¶16 With respect to Scott's excluded testimony, the court found as follows:

> If [trial counsel] had responded to the objection that the evidence was not hearsay because it was not being offered to prove the truth of the matter asserted, and [Scott] had been allowed to testify

about that argument, [Scott] would have testified to the following:

a.  [A few days] before the shooting Teresa and [Scott] were arguing. During that argument [Scott] said to Teresa, "at least I take the kids and go do stuff. You just lay around and sleep all day."

b.  Teresa replied that "while you was gone with the boys I didn't sleep, I went to the gun range." Then she held her fingers formed into a circle over her chest and said, "I got them in a group 'this' big."

c.  In the context of that argument, [Scott] took Teresa's statement to be a threat that she would or could shoot [him].

¶17   With the additional findings of fact generated by the district court, we consider anew Scott's claims on appeal.

ISSUES AND STANDARDS OF REVIEW

¶18   At this stage of the appeal, we are presented with two issues. First, Scott argues that the verdict-urging instruction was "coercive under the circumstances" of this case and that the trial court erred by giving it. "We review for correctness whether the trial court's delivery of a [verdict-urging] instruction denied [the d]efendant a fair trial." *State v. Dalton*, 2014 UT App 68, ¶ 25, 331 P.3d 1110.

¶19   Scott also argues that his trial counsel was constitutionally ineffective in failing to adequately argue against the hearsay challenge and obtain admission of the content of Teresa's threat. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and

we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (quotation simplified).

ANALYSIS

I. The Verdict-Urging Jury Instruction

¶20　When a trial court "is informed by a jury that they are having difficulty in agreeing, it is not error for the court to impress upon [jurors] the importance of the case, urge them to come to agreement, and send them back for further deliberation." *State v. Lactod*, 761 P.2d 23, 30 (Utah Ct. App. 1988) (quotation simplified). The United States Supreme Court first authorized the use of such supplemental verdict-urging instructions with deadlocked juries in *Allen v. United States*, 164 U.S. 492 (1896). "[H]ence, such instructions are often referred to as '*Allen* charges.'" *Lactod*, 761 P.2d at 29.

¶21　Although "[s]ome jurisdictions have abandoned the *Allen* charge," others have merely "limited it." *Id.* Utah falls within the latter category, as Utah courts have recognized that verdict-urging charges are "a reasonable and proper exercise of the [trial] court's power to guide the jury to a fair and impartial verdict"—as long as such an instruction does not "coerce the jury into returning a verdict because [a coercive instruction] amounts to a denial of a fair and impartial jury trial and is, therefore, a denial of due process." *See id.* at 30–31; *see also State v. Bess*, 2019 UT 70, ¶ 58, 473 P.3d 157 ("Utah courts have repeatedly upheld the use of deadlock instructions as a permissible way to guide the jury to a fair and impartial verdict, so long as the instruction is not coercive." (quotation simplified)). This court has developed a two-part test to determine whether the challenged verdict-urging instruction "will be deemed coercive," which requires us to consider whether "(1) the language of the supplemental charge can properly be said to be coercive per se, or (2) it is coercive under

the specific circumstances of the case." *State v. Ginter*, 2013 UT App 92, ¶ 6, 300 P.3d 1278 (quotation simplified); *accord Lactod*, 761 P.2d at 31 ("If the terms of the charge are not coercive per se, then we must consider, under the specific circumstances of the case, whether the charge was proper after the jury had reported an inability to reach a verdict.").

¶22 Scott does not argue that the language of the trial court's charge was coercive per se; instead, he focuses on whether it was coercive under the circumstances. Therefore, we do not address whether the supplemental instruction was coercive per se and move straight to analyzing whether the instruction was proper "under the specific circumstances of the case." *See Lactod*, 761 P.2d at 31. Because Scott has not shown coerciveness under the circumstances, we cannot say that the verdict-urging instruction was improper.

¶23 Under *Lactod*, courts must consider certain factors when assessing whether an instruction was coercive under the circumstances, including "any colloquy between the judge and the jury fore[person], circumstances surrounding the giving of the instruction, and consideration of the American Bar Association Standards on Criminal Justice Relating to Trial by Jury." *Id.* (quotation simplified); *accord Ginter*, 2013 UT App 92, ¶ 6.

¶24 Beginning with "any colloquy" between the trial court and jury foreperson, there was no conversation, but there were two jury notes. The first requested a legal definition of "substantially caused." The second informed the judge that the jury was "at an absolute impasse," and was split "6-2," with two jurors "feel[ing] that 'substantially caused' needs to be 'the majority of the time.'" The court did not provide a definition in response to the first note, instead allowing the jurors to apply an ordinary meaning to the phrase. And in response to the second note, the court provided a supplemental instruction, encouraging the jury to continue deliberating.

¶25    Scott contends that "by not providing any insight into the definition of 'substantially caused,'" the trial court's verdict-urging instruction communicated to the jury that its disagreement over the meaning of that phrase "was not legitimate enough to preclude a verdict." We disagree. In instructing the jurors "to consult with one another and to deliberate, with a view to reaching an agreement," the court also reminded them to "not surrender [their] honest convictions . . . for the mere purpose of returning a verdict." Thus, the court did not discount the jurors' disagreement or communicate that it was less important than reaching a verdict. Further, the jury's disagreement over the meaning of the phrase "substantially caused" was a disagreement that had the potential of being resolved with further deliberation. Thus, the aspects surrounding the colloquies between the jury and the trial court here did not signal any sort of coercion.

¶26    Looking next to the "circumstances surrounding the giving of the instruction" itself, *see State v. Lactod*, 761 P.2d 23, 31 (Utah Ct. App. 1988) (quotation simplified), our case law suggests that the circumstances may demonstrate coercion if (1) the jury is aware that the court knows that one juror is in the minority and (2) the verdict-urging instruction singles out that minority juror. Once the jury is aware that "the trial judge ha[s] been informed that a single juror [is] not in agreement with the majority," there is a risk that "holdout juror[s] might have the mistaken impression that [they are] being directly and individually instructed by the trial judge to defer to the conclusions of the majority." *See Ginter*, 2013 UT App 92, ¶¶ 8, 14 (quotation simplified); *see also State v. Harry*, 2008 UT App 224, ¶ 31, 189 P.3d 98 ("Where the jury voluntarily informed the judge that they were split seven to one, the trial court's instruction that only the holdout juror reconsider whether the doubt in her mind was reasonable in light of the fact that so many other similarly informed and motivated jurors had concluded otherwise was coercive. . . . [T]he knowledge that one juror stood alone against the others made [the instruction's other] statement[s] insufficient to counterbalance fully the prior statements urging acquiescence."). In *Harry*, for example, the court first addressed

only the minority, instructing "each dissenting juror" in favor of acquittal to "reconsider whether any doubt they held was reasonable." 2008 UT App 224, ¶ 17 (quotation simplified). And although the court tried to counterbalance that instruction by advising the remaining jurors to consider whether to accept evidence that failed to convince "several of their fellow jurors," *id.* ¶ 18 (quotation simplified), the fact that the court knew that "one juror stood alone against the others" made the instruction unduly coercive,[6] *id.* ¶ 31.

¶27    Here, as in *Harry* and *Ginter*, the trial court was informed of how many jurors were in the minority (though not whether the minority was for conviction or acquittal), and the jury knew that the court was aware it was split, because the second note stated the jury was deadlocked "6-2." But unlike the verdict-urging instructions in both *Harry* and *Ginter*, the verdict-urging instruction in this case made no distinction between majority and minority jurors. Instead, the court neutrally instructed "[a]ll jurors" to "consider whether their position is a reasonable one." It also did not suggest that jurors should reconsider their positions based on the opinions of "a substantial majority," "a majority or even a lesser number," or "several of their fellow jurors." *See Harry*, 2008 UT App 224, ¶¶ 17–18 (quotation simplified); *see also Ginter*, 2013 UT App 92, ¶ 11 (urging jurors to consider the opinions of "a substantial majority," "a majority or even a lesser number," and "your fellow jurors" (quotation simplified)). To the contrary, the language of the instruction here urged jurors to reconsider evidence "when it makes no impression on the minds of *another* equally honest, equally intelligent juror," suggesting that the opinion of any single juror should be considered by all other jurors. (Emphasis added.) The instruction further informed all jurors to "decide the case for" themselves after considering "the case with [their] fellow jurors" and not to "surrender [their] honest convictions concerning the effect or weight of evidence for the mere purpose of returning a verdict or solely because of the

6. The instruction in *Ginter* was nearly identical. *See State v. Ginter*, 2013 UT App 92, ¶ 11, 300 P.3d 1278.

opinion of the other jurors." In short, nothing in this instruction might have given minority jurors "the mistaken impression that [they were] being directly and individually instructed by the trial judge to defer to the conclusions of the majority." *See Ginter*, 2013 UT App 92, ¶ 8 (quotation simplified). Even though the court in this case knew there were two holdout jurors, that fact alone does not suggest coercion where the instruction did not single out those jurors.

¶28    Another aspect relevant to whether the circumstances surrounding the instruction were coercive is the duration of time the jury spends deliberating after the instruction is given. *Compare Lactod*, 761 P.2d at 31 (citing the fact that "the jury continued to deliberate after receiving the instruction for another hour and fifteen minutes" as one circumstance indicating non-coerciveness because it "suggest[ed] that minority jurors did not instantly acquiesce to the majority"), *with Harry*, 2008 UT App 224, ¶ 33 ("[T]he fact that the jury reached a verdict only twenty-six minutes after receiving the modified *Allen* instruction suggests that the sole dissenting juror was, in fact, coerced and instantly acquiesced to the majority." (quotation simplified)), *and Ginter*, 2013 UT App 92, ¶ 12 (analogizing to *Harry* and determining that the instruction and surrounding circumstances created "an atmosphere of coercion" where, among other similarities to that case, "the jury returned with a verdict in less than thirty minutes" after receiving the instruction). Here, the jury continued to deliberate for just over two hours after it received the verdict-urging instruction. This period stands in stark contrast to *Harry* and *Ginter*, where those juries deliberated for fewer than thirty minutes, and even exceeds the time the jury spent deliberating in *Lactod*, in which this court concluded that an additional hour and fifteen minutes of deliberations suggested that there was no coercion.

¶29    Furthermore, the trial court "did not threaten to or keep the jury deliberating for an unreasonable length of time." *See Lactod*, 761 P.2d at 31. Here, the court gave the instruction at approximately 6:00 p.m. after the jury had been deliberating for

five-and-a-half hours. Again, these circumstances are similar to those in *Lactod*, in which this court determined that the timing circumstances were noncoercive when the jury had deliberated for five hours before receiving the deadlock instruction, then deliberated for an additional hour and fifteen minutes thereafter. *See id.* at 24, 31. Indeed, the trial court here appropriately took timing concerns into account when discussing with counsel the propriety of giving an *Allen* instruction, noting that it was not yet "late at night," which for a weeklong trial meant that the jury had not been deliberating "that long." We find this reasoning sound because, in light of the weeklong trial and the seriousness of the charges, urging continued deliberation after just five hours of deliberation does not seem unreasonable. As a result, the timing circumstances surrounding giving the instruction weigh against a finding of coercion under the second factor.

¶30 The third *Lactod* factor, whether the instruction falls "reasonably within the ABA-recommended standards for verdict-urging instructions," 761 P.2d at 31, yields a more nuanced result in this case. The instruction the trial court gave largely mirrors the content of the ABA standards but differs in one notable respect: whereas "the ABA instruction makes no mention of the cost or inconvenience of retrial," *see Harry*, 2008 UT App 224, ¶ 34, the instruction given here emphasized those things. *Compare generally supra* ¶ 10, *with ABA Standards for Criminal Justice Discovery & Trial by Jury* § 15–5.4 (3d ed. 1996) (hereinafter *ABA Standards*), *reproduced in Lactod*, 761 P.2d at 30 n.3. Specifically, the instruction informed Scott's jury that the trial was "a significant expenditure of time and effort by you, the court, the parties, and their attorneys," and advised, "If you should fail to agree upon a verdict, the case is left open and may have to be tried again, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried to you."

¶31 This court found similar language problematic in *Ginter*, where the instruction at issue noted the "expense in time, effort, money and emotional strain" the case had involved. 2013 UT App

92, ¶ 12 (quotation simplified). In reaching that conclusion, this court relied on guidance from *Harry*, but observed that "the *Harry* court [had] recognized that such language was not *necessarily* coercive." *See id.* (emphasis added). Indeed, based on the structure and content of this analysis, and where it appears in the overall opinion in *Ginter*, it seems that this technical infirmity in the instruction was inconsequential, rather than the primary factor, leading to this court's determination that the charge was coercive under the circumstances of that case. *See id.* ("[W]e also consider this language to *contribute* to the creation of an atmosphere of coercion." (emphasis added)).

¶32 And this reading of *Ginter* makes sense because other statements in our case law indicate that a technical divergence from what the ABA standards recommend is not necessarily dispositive to the coerciveness analysis. *See State v. Lactod*, 761 P.2d 23, 31 (Utah Ct. App. 1988) (directing the court to "consider[]" the standards, and finding an instruction noncoercive when it was "reasonably within" the standards); *see also Harry*, 2008 UT App 224, ¶ 26 ("Based upon the guidance from our supreme court, prior opinions of this court, and the decisions upon which that Utah precedent relies, we decline [the] invitation to limit our trial courts to using *only* the ABA model." (quotation simplified) (emphasis added)). Instead, it is the exact manner and degree to which the instruction deviates from the ABA standards that matters. *See Ginter*, 2013 UT App 92, ¶ 12.

¶33 Crucially, the trial court here did not tell the jury it was *required* to reach a decision, nor did it aim the instruction directly toward the jurors who were in the minority—which are two characteristics that this court has previously identified as contributing to coercive circumstances. *See Lactod*, 761 P.2d at 31 (finding no coercion where "the trial [court] did not tell the jury that it was required to reach a decision"); *Harry*, 2008 UT App 224, ¶ 34 (finding the charge coercive when it "was directed only to the sole dissenting juror," and contrasting with "[t]he ABA standard [that] does not single out the minority jurors but instead sends an even-handed message"); *accord Ginter*, 2013 UT App 92,

¶¶ 9–11. Indeed, the instruction here stated the exact opposite, telling the jury, "If you should fail to agree upon a verdict, the case is left open and may have to be tried again," "*All jurors* should consider whether their position is a reasonable one," and "[I]t is your duty as jurors to consult with one another and to deliberate, with a view to reaching an agreement, *if you can do so without violence to your individual judgment*." (Emphasis added.) This language hews closely to the ABA standards, applying to all jurors evenly and leaving open the possibility of retrial if they ultimately could not agree on a verdict. *See ABA Standards* § 15–5.4(a)(2), (a)(4), (c). In the end, although the court "did indicate that [it] and the jury had invested a substantial amount of time in the case, [the court] was only stating the obvious," and made sure to "counterbalance[]" this language with the other, stronger statements noted above. *See Lactod*, 761 P.2d at 31. Thus, reminding the jury of the expended time and effort and the risk of retrial is not enough on its own to make the instruction coercive under the third factor.

¶34 After considering the verdict-urging jury instruction through the lens of each *Lactod* factor, we conclude that Scott has not demonstrated coercion based on the circumstances of his case. Accordingly, the instruction does not provide a basis for us to reverse his conviction.

## II. Ineffective Assistance of Counsel

¶35 Scott next contends that he received ineffective assistance of counsel when his trial counsel failed to make any argument to the trial court that the content of Teresa's threat was not hearsay because it was being used for a non-hearsay purpose. To prevail on his ineffective assistance claim, Scott must show both (1) that his trial counsel's performance was "deficient" by falling "below an objective standard of reasonableness" and (2) that this "deficient performance prejudiced the defense" by giving rise to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). We

assess whether Scott received ineffective assistance within this framework.

¶36    First, to establish deficient performance, Scott "must show that trial counsel's 'representation fell below an objective standard of reasonableness' when measured against prevailing professional norms." *See Honie v. State*, 2014 UT 19, ¶ 32, 342 P.3d 182 (quoting *Strickland*, 466 U.S. at 687–88). He must "overcome the presumption that . . . the challenged action might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689 (quotation simplified). Here, as this court explained more fully in our previous opinion—and as all parties agree—Scott's testimony regarding the content of Teresa's threat was not hearsay because Teresa's statements were not being offered to prove the truth of what she asserted, rather they were being offered to prove the effect the words had on Scott. *See Scott I*, 2017 UT App 74, ¶¶ 21–23, 397 P.3d 837, *rev'd* 2020 UT 13, 462 P.3d 350. And if trial counsel had made an appropriate responsive argument, Scott would have presumably been allowed to testify about the specifics of the threat (or at the very least the issue would have been preserved for a direct challenge of the trial court's action). *See id.* ¶ 23.

¶37    Our review of the record as supplemented by the rule 23B remand certainly suggests that trial counsel failed to correctly argue the rules of evidence. The district court explicitly found on remand that trial counsel had "planned" all along to introduce the content of Teresa's threat and that revealing Teresa's threat to the jury was central to the defense's "main objective" of showing that the threat, along with Teresa's other conduct, "caused [Scott's] extreme emotional distress." But merely finding error in counsel's actions is not dispositive, as "[i]t is not correct to equate counsel's submission to an error with deficient performance." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871. Instead, Scott "must show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *See Strickland*, 466 U.S. at 687.

¶38 Furthermore, and as the State pointed out at oral argument, strategies adopted by counsel are not static and can change at any moment during trial. Trial counsel could have read the jury's reactions in the moment and determined that Scott's reference to "the threat" he had received alone, or the act itself of the prosecutor objecting, had the intended effect on the minds of the jury. Either of these determinations (or both) could have served as "a sound strategic reason for counsel's actions." *See Scott II*, 2020 UT 13, ¶ 35, 462 P.3d 350 (citing *Strickland*, 466 U.S. at 689). Such a split-second change of course may seem unexpected based on the district court's findings regarding the original defense strategy, but that does not render it unreasonable. *Cf. Ray*, 2020 UT 12, ¶ 32 ("We must view a decision to not object in context and determine whether correcting the error was sufficiently important *under the circumstances* that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." (emphasis added)). And where we can attribute "the challenged action" to a "sound trial strategy, it follows that counsel did not perform deficiently." *Scott II,* 2020 UT 13, ¶ 35 (quotation simplified).

¶39 Moreover, even if trial counsel did perform deficiently by failing to make a persuasive responsive argument that Scott's recounting of Teresa's threat was not hearsay, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Rather, Scott must "demonstrate a reasonable probability that the outcome of his . . . case would have been different absent counsel's error." *See Scott II*, 2020 UT 13, ¶ 43. Accordingly, we ask whether there is a reasonable probability that the jury verdict would have been different had the jury heard the actual words of Teresa's threat. Under the version of the Utah Code in effect at the time of Teresa's death,[7] a person charged with murder could seek

---

7. The "extreme emotional distress" special mitigation is still available, but the relevant section was significantly amended

(continued…)

"[s]pecial mitigation" and "instead be found guilty of manslaughter" if the trier of fact found "by a preponderance of the evidence" that the defendant, at the time of the killing, had been "under the influence of extreme emotional distress for which there is a reasonable explanation or excuse." *See* Utah Code Ann. § 76-5-205.5(1)(b), (5) (LexisNexis 2012). No mitigation would have been available if the jury had determined that Scott's emotional distress was "substantially caused by [his] own conduct." *See id.* § 76-5-205.5(3)(b).

¶40    Thus, "[i]n this context, evaluating prejudice requires us to consider whether there was a reasonable probability that at least one juror[8] would have concluded that [Scott] acted under extreme emotional distress" that was not substantially caused by his own conduct if the juror had heard the specifics of Teresa's threat, rather than just Scott's statement that she threatened him. *See Ross v. State*, 2019 UT 48, ¶ 97, 448 P.3d 1203. To assess the relative importance of this piece of evidence if it had been before the jury, we must examine more closely what Scott was required to show to demonstrate extreme emotional distress.

¶41    Ultimately, "the factfinder must make two findings for the defense of extreme emotional distress to attach," determining

---

since our decision in *Scott I*. *Compare* Utah Code Ann. § 76-5-205.5 (LexisNexis 2012), *with id.* (Supp. 2020).

8. "[A] unanimous vote of the jury" would have been required to convict Scott of manslaughter under the "special mitigation" of extreme emotional distress. *See* Utah Code Ann. § 76-5-205.5(6)(a). But "[i]f the jury is unable to unanimously agree whether or not special mitigation has been established, the result is a hung jury." *Id.* § 76-5-205.5(6)(d). So, because the prejudice analysis hinges on whether there is a "reasonable probability" of a "different" result, *see Strickland v. Washington*, 466 U.S. 668, 694 (1984), the probability of a hung jury is the counterfactual result we consider, as opposed to whether the *entire* jury would have agreed on the existence of extreme emotional distress.

"whether: (1) subjectively, the defendant committed the killing while under the influence of extreme emotional distress, and (2) objectively, a reasonable person would have experienced an extreme emotional reaction and loss of self-control under the circumstances." *Id.* ¶ 98 (quotation simplified). The first, subjective component incorporates four sub-requirements: (1) exposure to "extremely unusual and overwhelming stress"; (2) an "extreme emotional reaction" resulting in a "loss of self-control" and reason being "overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions"; (3) the emotional distress did not result from "mental illness," as that term is defined in Utah Code section 76-2-305; and (4) the emotional distress was "not substantially caused by [the defendant's] own conduct." *State v. Sanchez*, 2018 UT 31, ¶ 43, 422 P.3d 866 (quotation simplified). The second, objective component essentially asks "whether a reasonable person facing the same situation would have reacted in a similar way." *Id.* ¶¶ 44, 46 (quotation simplified).

¶42 On appeal, Scott asserts that the content of Teresa's threat—telling Scott that she had been recently practicing her shooting and indicating she "got them in a group 'this' big," while making a circle with her fingers over her chest—would have been "more evidence contributing to Scott's distress [in] the moments leading to the shooting," which "would have only helped" the jury reach the defense's desired finding of extreme emotional distress. Scott also argues that the jury's view on "[t]he reasonableness of his emotional distress [would have been] significantly impacted by gaining access to why he believed [Teresa] might have that gun and why he believed she posed a threat to him." Thus, Scott attempts to tie the significance of the threat's content to the first sub-showing required as part of the subjective element—that is, whether Scott, subjectively, "was exposed to extremely unusual and overwhelming stress"—as well as to the objective element—that is "whether a reasonable person" hearing this from Teresa "would have reacted in a similar way." *See id.* ¶¶ 43–46 (quotation simplified).

¶43    Scott further contends that the actual content of the threat would have been the missing "connection between Scott being scared to death and that gun missing from the safe." But although the content of the threat may have added some detail to the overall evidentiary picture, we are not convinced it would have tipped the balance in Scott's favor.

¶44    In evaluating the effect of the suppression of Scott's testimony regarding the details of Teresa's threat, it is important to explore the evidence the jury *did* hear. This was not a situation in which all evidence of Teresa's threat was excluded. Rather, the jury heard Scott testify that after he saw the safe was open and the gun missing, he recalled "the threat that [he] received the day before . . . that she was going to . . . ." Scott was cut off before he described what Teresa said she was going to do, but he testified that "there was a threat made" and that he "thought the threat was serious." And when asked whether, after seeing the gun missing, he was "worried that Teresa was going to use that gun to do some harm to [him]," he responded, "Yes," he was "scared to death." Despite hearing this testimony, the jury rejected Scott's argument that the threat mitigated his actions.

¶45    The district court found on remand that if the trial court had not excluded further testimony about the threat, Scott would have testified that Teresa reported that she was "able to get all the shots in a pattern 'that big'," while holding her hands "over her heart forming a circle with her fingers." The court also found that Scott would have further testified about the statement's effect on him: that he understood Teresa's statement "to be a threat that she would or could shoot [him]." But we are skeptical that if the jury had heard the additional testimony, it is reasonably likely it would have rendered a different verdict.

¶46    The jury heard that Teresa threatened Scott the day before her gun had been removed from the safe and that Scott thought the threat was serious, that he was "scared to death," and that as a result of the threat, he was worried Teresa would "do some harm to [him]" when he saw the gun was not in the safe. The

actual contents of the threat revealed on rule 23B remand did not make the threat seem worse than what he had already described; if anything, it was veiled and less menacing. Scott's statement at trial about "the threat that [he] received the day before . . . that she was going to . . ." made the threat seem more explicit than the threat he actually received. And although we are not suggesting that he could not perceive the comment as threatening, it is not reasonably likely that the jury would have perceived the threat as more menacing had it known its actual contents. In fact, as our supreme court postulated in *Scott II*, "[t]he actual words of a weak threat could have hurt, rather than helped, Scott's defense because the jury could have viewed his reaction as irrational and disproportionate." 2020 UT 13, ¶ 45, 462 P.3d 350. It appears that the supreme court's supposition has been borne out; after remand, it is apparent that the threat was comparatively weak to what the jury likely imagined when Scott described a serious threat that left him "scared to death." At the very least, Teresa's actual words (and actions) did not appear to be more serious than what Scott had already described.

¶47    Scott also asserts that the content of Teresa's threat would have affected the jury's consideration of whether he had "substantially caused" his own emotional distress—the fourth sub-component of the subjective element. *See Sanchez*, 2018 UT 31, ¶ 43; Utah Code Ann. § 76-5-205.5(3)(b). This argument is unavailing for several reasons.

¶48    First, Scott focuses on the "substantially caused" showing being evidenced by the deadlocked jury, asserting that six jurors "believed Scott's emotional distress was substantially caused by his own conduct," while the other "two . . . believed Scott's emotional distress was not substantially caused by his own conduct." But as noted *supra* ¶ 27, the record was not clear that this was precisely how the jury split. The trial court even postulated that the jury "might actually be breaking in favor of the defense." Thus, given that the record is inconclusive on the nature of the "6-2" split, Scott cannot show prejudice by the fact of the split because his assertion that two jurors were convinced

he had not substantially caused his own distress is not established by the record.

¶49    Second, as with the degree of Scott's distress and the reasonableness of his reaction, evidence about the exact nature of the threat would have done little to dispel any notion the jury may have had that Scott "substantially caused" his own distress. As previously noted, the jury heard that Scott received a "serious" threat that Teresa was "going to do" something to him, which he claimed made him "scared to death" when he saw the gun missing from the safe. Scott has not persuaded us that it is reasonably likely that the jury would have reached a different conclusion about Scott's contribution to his own distress had the jury heard a few more details about Teresa's statement and gesture. To the contrary, if the jury credited Scott's testimony, it already had the opportunity to factor Teresa's threat and his fearfulness into its assessment of whether Scott "substantially caused" his own distress. And Scott has not explained why it is reasonably likely that the jury would have viewed the evidence differently with the additional detail.

¶50    In short, it is not reasonably likely that the addition of the substantive content of Teresa's threat would have altered the jury's assessment of Scott's testimony about his own conduct and his emotional reactions to Teresa's conduct immediately before he killed her. Therefore, we cannot conclude that hearing the words of what was ultimately a veiled threat would have made a difference to the jury's analysis of whether Scott had subjectively caused his own distress. In fact, hearing the threat may have worsened Scott's position. Accordingly, because he cannot show a reasonable likelihood of a different result, Scott's ineffective assistance claim fails.

CONCLUSION

¶51    The trial court's verdict-urging instruction was not coercive under the circumstances. And because Scott has not

demonstrated that if the jury had heard testimony of the specific content of Teresa's threat it is reasonably likely that it would have reached a different verdict, his ineffective assistance claim fails. Accordingly, we affirm his conviction.

————————

APPLEBY, Senior Judge (concurring in part and dissenting in part):

¶52    I concur with the majority opinion concerning the verdict-urging jury instruction but dissent with respect to whether Scott received effective assistance of counsel. In my view, he did not. I conclude that Scott met his burden of persuasion to show both deficient performance and prejudice, and therefore I would reverse and remand the case for a new trial.

¶53    Establishing ineffective assistance of counsel requires Scott to "show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense." *See State v. Gallegos*, 2020 UT 19, ¶ 33, 463 P.3d 641 (quotation simplified); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). Scott has made those showings.

¶54    With respect to the first prong of the ineffective assistance of counsel analysis, our supreme court's reversal of this court's initial decision stated that without knowing "the words and how they were spoken, nor the context of the threat," "it is impossible to conclude that counsel's inaction was objectively unreasonable." *State v. Scott* (*Scott II*), 2020 UT 13, ¶ 38, 462 P.3d 350. "If the specific details of the alleged threat did not add to the evidence counsel did successfully place before the jury, then counsel may have reasonably chosen not to argue for the introduction of these details because he was uncertain how the jury would perceive them in any event." *Id.* ¶ 39. In this case, the context and details of the words and gesture of the threat would have added significantly to the evidence before the jury.

¶55    As to the second prong of the ineffective assistance of counsel analysis, the supreme court stated that "whether Scott was prejudiced also depends on the content of the threat." *Id.* ¶ 42. A defendant must "demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error." *Id.* ¶ 43. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The supreme court continued, "If the threat were not particularly compelling, it is possible Scott would have been harmed by its admission. The actual words of a weak threat could have hurt, rather than helped." *Scott II*, 2020 UT 13, ¶ 45. A statement by a person that she had been practicing shooting, coupled with a demonstration of her capacity for deadly accuracy, is not a weak threat.

¶56    On remand for findings concerning "the claimed deficient performance by counsel and the claimed prejudice suffered by [Scott] as a result,"[9] the district court's findings were organized as facts concerning trial counsel and facts concerning Scott. With respect to trial counsel, the court found that "[t]he main objective at trial was to show that [Scott] was under the influence of extreme emotional distress at the time of the shooting, and that the distress was not substantially caused by [Scott]'s own conduct." Further, "[t]he defense planned to show Teresa's conduct included her escalating the level of their fighting, a specific threat Teresa made in the days preceding the shooting, and Teresa's introduction of a gun into the already tense situation caused [Scott]'s extreme emotional distress." Counsel knew "what [Scott] would say about Teresa's statements."

¶57    As to the specific content of the threat, the district court found that counsel expected Scott would have testified that "[d]uring a fight a few days before the shooting, Teresa told

---

9. The district court docket includes a stipulation asking the court to forgo an evidentiary hearing, and the parties simultaneously filed a proposed Order and Findings of Fact Re: 23B Remand, which the court adopted.

[Scott] that . . . she took her gun to the shooting range . . . [and] was able to get all the shots in a pattern 'that big' and she held her hands over her heart forming a circle with her fingers." Scott interpreted this as a threat and "thought she was saying she had a gun and knew how to use it against him if she needed to." The findings regarding Scott were substantially similar, although the word "chest" was used instead of "heart."

¶58   The majority opinion expresses skepticism that if the jury had heard the content of the threat, it was reasonably likely to have rendered a different verdict. *Supra* ¶ 45. It notes that Scott testified that Teresa threatened him, that her gun was not in the gun safe, and that Scott was worried Teresa would harm him, but "[t]he actual contents of the threat . . . did not make the threat seem worse than what he had already described; *if anything, it was veiled and less menacing.*" *Supra* ¶ 46 (emphasis added). And because Scott testified at trial that Teresa threatened him, this "made the threat seem more explicit than the threat he actually received." *Supra* ¶ 46. The majority opinion concludes that "it is not reasonably likely that the jury would have perceived the threat as more menacing had it known its actual contents." *Supra* ¶ 46. It adds, "the threat was comparatively weak to what the jury likely imagined when Scott described a serious threat that left him 'scared to death.' At the very least, Teresa's actual words (and actions) did not appear to be more serious than what Scott had already described." *Supra* ¶ 46.

¶59   I disagree. The reasonable inference of Teresa's verbal threat, including her description of practicing at the gun range, coupled with the gesture of placing her circled fingers over her heart or chest, is that she had been developing firearms proficiency such that she would and could shoot Scott in a place on his body that would or could kill him. Indeed, the parties stipulated—and the district court found on remand—that Scott thought Teresa would or could shoot him. This would have added to Scott's testimony that he was "scared to death." What Teresa said and did, including her statement that she had been practicing shooting and her statement and gesture that she had reached

potentially lethal proficiency, combined with her gun's absence from the safe, demonstrated that she was preparing to shoot Scott and that she could hit him in the heart or chest. This is not a weak threat but, rather, a specific declaration of Teresa's preparation and ability to kill Scott.

¶60　The "main objective" of the defense was "to show that [Scott] was under the influence of extreme emotional distress at the time of the shooting, and that the distress was not substantially caused by [Scott]'s own conduct." As the district court found pursuant to the rule 23B remand, trial counsel knew the specific content of the threat and tried to elicit testimony about it, but it was excluded as hearsay. Accordingly, our supreme court's concern that "counsel may have reasonably chosen not to argue for the introduction of these details because he was uncertain how the jury would perceive them in any event," *Scott II*, 2020 UT 13, ¶ 39, seems misplaced given what we know of the complete facts. And yet trial counsel did nothing to assist the district court to understand that the threat was not hearsay. *Id.* ¶¶ 17–19. This was deficient performance, and as this court articulated in *Scott I*, there was no sound strategic reason for counsel's silence, *see State v. Scott (Scott I)*, 2017 UT App 74, ¶ 28, 397 P.3d 837, *rev'd*, 2020 UT 13, 462 P.3d 350; indeed, the findings on remand demonstrate that counsel's intent was to introduce the evidence, and yet he failed to argue the applicable rules of evidence to introduce key testimony that would have supported Scott's intended defense. Failure to argue that the threat was not hearsay and therefore admissible fell below the objective standard of reasonableness. Because of this, I conclude that the first prong for establishing ineffective assistance of counsel has been satisfied.

¶61　I also disagree with the majority regarding whether the absence of the threat's content prejudiced Scott's defense. More specific evidence regarding this particular threat—a threat that Teresa had been practicing shooting her gun and achieved sufficient proficiency to kill Scott—made it reasonably probable that the result of the trial would have been different. As it was,

Scott was unable to offer testimony about Teresa's words and gesture, and this had adverse consequences for Scott. Indeed, in closing argument, the prosecution argued that the gun's absence from the safe was not a reasonable basis for Scott's extreme emotional distress. Scott needed the additional testimony about the specifics of the threat to be able to rebut the prosecutor's argument. Furthermore, we know from the questions the jury asked that its initial deadlock was based on this very issue—the cause of Scott's emotional distress. If Scott had been allowed to testify regarding the threat's content, it is reasonably probable the jury would have continued to be deadlocked, which would have meant a mistrial. As this court noted in *Scott I*, the probability of a mistrial is sufficient to undermine confidence in the outcome of this trial. *Id.* ¶ 34.

¶62　　Given that extreme emotional distress was the cornerstone of Scott's defense, the threat's content was essential, and therefore counsel's failure to argue that it was not hearsay was deficient performance and the absence of its content from what was presented to the jury was prejudicial to the defense. I would hold that Scott is entitled to a new trial.

---